EUGENIE PARNAR, Plaintiff-Appellant, *v.* AMERICANA HOTELS, INC., a Delaware corporation, FLAGSHIP INTERNATIONAL, INC., a Delaware corporation, and MARK E. LIQUORI, Defendants-Appellees

NO. 8159

(CIVIL NO. 52878)

OCTOBER 28, 1982

RICHARDSON, C.J., LUM, NAKAMURA, PADGETT AND HAYASHI, JJ.

OPINION OF THE COURT BY HAYASHI, J.

The question raised by this appeal is whether Appellant Eugenie Parnar (hereinafter Parnar), whose contract was of indefinite duration hence terminable at the will of her employers, may sue for damages for an allegedly retaliatory discharge. The lower court held she could not and granted appellees' two motions for summary judgment as to all six counts of Parnar's complaint. Parnar appeals from these orders granting summary judgment and from the lower court's denial of her motion for reconsideration and/or relief from judgment. For the reasons set forth below, we reverse in part and affirm in part the lower court's judgment.

I.

Appellees Americana Hotels, Inc. (hereinafter Americana) and Flagship International, Inc. (hereinafter Flagship) are Delaware corporations doing business in Hawaii. Americana is the managing partner and Flagship is the operator of the Ala Moana Hotel, at which Parnar was employed from August 16, 1972, through October 24, 1975, as secretary to the controller of the hotel. At all times relevant to this action, Appellee Mark E. Liquori (hereinafter Liquori) was the Ala Moana Hotel's controller.

Parnar worked under the supervision of Liquori from March 1975, when Liquori became controller, until her termination by him on October 24, 1975. Parnar's duties included obtaining information from various hotels concerning their average rates and occupancy percentages, exchanging similar information for the Ala Moana Hotel, and tabulating such information for subsequent distribution to and use by the officers and employees of the Ala Moana Hotel and the officers and employees of Americana and Flagship. Parnar participated in the exchange of information upon the instruction of the controller who preceded Liquori. Liquori, upon learning of the practice, authorized its continuation believing that such conduct was lawful.

Sometime prior to September 17, 1975, the Antitrust Division of the United States Department of Justice commenced an investigation into the activities of the owners, operators, and employees of

several hotels in the state to determine whether such persons had engaged in anti-competitive practices in violation of the Sherman Antitrust Act. Based upon the results of its investigation, the Antitrust Division obtained criminal indictments against Flagship[1] as well as various hotels.

Parnar was unaware, prior to initiation of the Antitrust Division's investigation, that her exchange of rate and occupancy information might violate the antitrust laws. On September 17, 1975, Parnar was informed by Liquori that she was to meet on September 19, 1975, with an attorney for Americana to discuss her knowledge of the exchanging of rate and occupancy information with other hotels. On September 19, 1975, Liquori told Parnar he would be sitting in on the meeting between Parnar and Allan Van Etten, the hotel's attorney. She requested that she be allowed to meet with Van Etten privately, and Liquori agreed.

Immediately after the meeting with Van Etten, Parnar was called into Liquori's office. The parties' versions of the discussion which ensued differ but both are in agreement that Parnar became distraught during the discussion.

After Parnar's meeting with Van Etten, the relationship between her and Liquori deteriorated. On September 23, 1975, Liquori filed personnel forms to terminate Parnar effective October 24, 1975. The release stated that Parnar was "[u]nable to do a satisfactory job."[2]

Parnar was not notified of her termination until October 24, 1975, when she was summarily dismissed by Liquori without severance pay. Liquori suggested that she go home to the mainland because she was having trouble here financially.

Subsequent to her termination, Parnar was interviewed by Department of Justice attorneys regarding her knowledge of possible antitrust violations, but she was not called as a witness in any criminal

---

[1] The record is rather unclear but suggests that these proceedings were concluded by an agreement.

[2] Liquori had never previously expressed dissatisfaction with Parnar's work. Throughout her tenure at the hotel, Parnar had received several merit increases.

or civil proceeding related thereto. Appellees had no further contact with Parnar after her dismissal.

On October 24, 1977, Parnar filed a six-count complaint against Liquori, Americana, Flagship, and individual, partnership, and corporate John Does alleging, *inter alia,* that Liquori and a person or persons unknown conspired to discharge Parnar in order to induce her to leave the jurisdiction and prevent her testimony before the grand jury or any subsequent criminal trial and that such discharge was without cause (Count I) and malicious (Count II). Parnar sought special, general, and punitive damages from appellees, jointly and severally.

On September 25, 1979, appellees moved for summary judgment on all counts. At a hearing on October 16, 1979, appellees' motion was granted as to all counts except Count I, the court finding that as an at-will employee, Parnar had no claim for a retaliatory discharge unless her termination was "in violation of law." The court retained jurisdiction of Count I, which it called the "obstruction of justice" claim (despite the existence of another count specifically denominated as such), to permit Parnar additional time to adduce evidence regarding the conspiracy alleged.

On July 23, 1980, appellees moved for summary judgment on Count I, on the grounds that Parnar could show no conspiracy. The motion was heard on July 31, 1980, and granted on August 26, 1980, the court apparently finding no genuine issue of material fact. Parnar's subsequent motion for reconsideration and/or relief from judgment was denied on October 21, 1980.

Parnar contends on appeal that: (1) the lower court erred substantively in finding that she had no cause of action for retaliatory discharge, and that she indeed has a right to sue for a discharge in bad faith or in contravention of public policy; and (2) genuine issues of material fact remained, particularly regarding the motivation for her discharge and the existence of a conspiracy to terminate her.

Appellees assert that assuming the availability of a cause of action for wrongful discharge, either in bad faith or in violation of public policy, Parnar adduced insufficient evidence on those claims to withstand summary judgment.

To properly assess the validity of the parties' claims, we first briefly trace the history of the terminable at-will doctrine.

## II.

It is evident from the record that Plaintiff was employed under a contract of indefinite duration. Such an employment contract is typically held to be terminable at the will of either party, for any reason or no reason. 9 S. Williston, Contracts § 1017 (3d ed. 1967); Annot., 51 A.L.R.2d 742 (1957).

Prior to the mid-nineteenth century, the arrangement between an employer and his employee was considered a status-based relationship, wherein the master was responsible for the servant's health, welfare, and security.[3] 1 W. Blackstone, Commentaries *426, noted what was later to become known as the "English rule":

> If the hiring be general without any particular time limits, the law construes it to be a hiring for a year . . . and no master can put away his servant, or servant leave his master, after being so retained, either before or at the end of his term, without a quarter's warning; unless upon reasonable cause to be allowed by a justice of the peace: but they may part by consent, or make a special bargain.

By the mid-nineteenth century, however, the protections afforded employees by the imposition of obligations on the employer were repudiated in favor of a more contractarian logic which limited the employer's duties to his employee. Emerging notions of the freedom of contract and of the value of economic growth contributed to the evolution of the at-will doctrine, epitomized by H. Wood's statement in his 1877 Treatise on the Law of Master and Service at § 134:

> With us the rule is inflexible, that a general or indefinite hiring is prima facie a hiring at will, and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof. A hiring at so much a day, week, month or year, no time being specified, is an indefinite hiring, and no presumption attaches that it was for a day even, but only at the rate fixed or whatever time the party may serve.

---

[3] Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 Harv. L. Rev. 1816, 1824 (1980) (hereinafter cited as *Protecting At Will Employees*).

Wood's formulation, known as the "American rule," soon represented the law governing termination of the employer-employee relationship. *See, e.g., Greer v. Arlington Mills Mfg. Co.,* 17 Del. (1 Penne.) 581, 43 A. 609 (Super. Ct. 1899); *McCullough Iron Co. v. Carpenter,* 67 Md. 554, 11 A. 176 (1887); *Martin v. New York Life Ins. Co.,* 148 N.Y. 117, 42 N.E. 416 (1895).[4]

By the beginning of the twentieth century, the employer's right to discharge "for good cause, for no cause or even for cause morally wrong"[5] was absolute. In recent years, however, Congress and the legislatures of many states have enacted legislation to protect employees from the whims of employers.[6] Nevertheless, absent a collective bargaining agreement, a contractual provision, or a statutorily-conferred right which reduces the likelihood of abusive or wrongful discharge, the at-will doctrine prevails.[7]

In apparent recognition of the plight of the largely unprotected private sector employee, many state courts have modified or

---

[4] This court embraced the then-prevalent at-will doctrine at an early date by holding that:

[A] hiring at a certain sum per month, no time being specified, unaccompanied by any facts or circumstances or any proof from which a different intention may be inferred, and when the testimony as to the contract is . . . not conflicting, is an employment for an indefinite term and not for a month, and terminable at the will of either party.

Crawford v. Stewart, 25 Haw. 226, 237 (1919).

In *Crawford,* this court was faced with the issue of whether a contract of carriage at the rate of ten dollars per month was terminable at will or terminable only at the end of the month, for the reason that the agreed-upon rate of pay also established the duration of the contract. After acknowledging the English rule, this court opted for Wood's American rule as the more reasonable rule. *Crawford, supra,* at 237. However, nowhere in *Crawford* was the scope of the employer's power to discharge for any or no reason discussed. Thus *Crawford* is for our purposes of historical interest only, although it accurately represents the state of our law on the question expressly decided there.

[5] Payne v. Western & A.R.R., 81 Tenn. 507, 519-20 (1884), *overruled on other grounds;* Hutton v. Watters, 132 Tenn. 527, 179 S.W. 134 (1915).

[6] Illustrative of federal regulation of wrongful dismissal is Title VII of the Civil Rights Act of 1964, § 703(a), 42 U.S.C. § 2000e-2 (1976).

[7] The at-will doctrine has invoked much scholarly examination. The seminal article on the subject is Blades, *Employment at Will v. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 Colum. L. Rev. 1404 (1967).

adopted exceptions to the terminable at-will doctrine by employing two general approaches, one in the nature of contract and the other sounding in tort, to circumvent harsh application of the doctrine.

Contractual relief has been afforded through the "additional consideration" doctrine, in which an employee's provision of consideration in addition to the services to be performed prevents the employer from terminating at will;[8] through implying a promise for employment of a fixed duration from the facts and circumstances surrounding the making of the agreement;[9] and through detrimental reliance.[10] Because none of these grounds of recovery have been urged before the trial court or this court, we intimate no view as to their applicability to this case.

A potentially expansive avenue of contractual modification is the implication of a duty to terminate in good faith. In *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977), an employer's discharge of his agent prior to payment of a commission earned by the employee was found to be a termination in bad faith. The court in *Fortune* recognized a general requirement that parties to contracts and commercial transactions act in good faith with one another. *See also Pstragowski v. Metropolitan Life Ins. Co.*, 553 F.2d 1 (1st Cir. 1977).

A similar but more broadly based contractual protection for wrongfully discharged employees was obtained in *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974). The plaintiff in *Monge* sought to recover damages for breach of her at-will employment contract, alleging that she was terminated for refusing to date her foreman. The New Hampshire Supreme Court found that the employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment and the public's interest in maintaining a proper bal-

---

[8] *See, e.g.*, Pearson v. Youngstown Sheet & Tube Co., 332 F.2d 439 (7th Cir. 1964); Stauter v. Walnut Grove Products, 188 N.W.2d 305 (Iowa 1971). *See generally*, Annot., 60 A.L.R.3d 226 (1974).

[9] *See* Grauer v. Valve & Primer Corp., 47 Ill. App.3d 152, 361 N.E.2d 863 (1977); Delzell v. Pope, 200 Tenn. 641, 294 S.W.2d 690 (1956).

[10] *See* O'Neill v. ARA Services, Inc., 457 F. Supp. 182 (E.D. Pa. 1978); Rowe v. Noren Pattern & Foundry Co., 91 Mich. App. 254, 283 N.W.2d 713 (1979).

ance between the two, and held that:

> [A] termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not in the best interest of the economic system or the public good and constitutes a breach of the employment contract.

*Id.* at 133, 316 A.2d at 551.

Parnar urges us to expand a wrongfully discharged employee's rights by imposing upon an employer an implied duty to terminate in good faith, in the manner of *Monge* and *Fortune.* Appellees contend that, even assuming the existence of a contractual action for breach of such a duty in this jurisdiction, Parnar adduced no evidence of bad faith sufficient to withstand the motion for summary judgment. We find it unnecessary to determine whether genuine issues of material fact precluded summary judgment on this claim since we refuse to recognize such a claim.

Like the court in *Monge,* we "cannot ignore the new climate prevailing generally in the relationship of employer and employee." 114 N.H. at 133, 316 A.2d at 551. Nor can we discount the trend to submit the employer's power of discharge to closer judicial scrutiny in appropriate circumstances. But to imply into each employment contract a duty to terminate in good faith would seem to subject each discharge to judicial incursions into the amorphous concept of bad faith. We are not persuaded that protection of employees requires such an intrusion on the employment relationship or such an imposition on the courts. We, therefore, hold that the lower court did not err in granting summary judgment as to Count II, which we construe as the bad-faith discharge claim.

### III.

Parnar alternatively urges this court to adopt the "public policy exception" to the at-will rule, wherein an employer is subjected to tort liability if his discharge of an employee contravenes some well-established public policy. She asserts that public policy is violated by discharge of an employee who gives truthful information about an employer's possible antitrust violations. Appellees assert that, if adopted, the public policy exception must be tightly circumscribed and applied only where a discharge violates legislatively-declared public policy. Appellees further assert that the public policy excep-

tion is unavailable in the instant case where they claim there was a plausible and legitimate reason for the discharge, *i.e.*, a personality conflict between Parnar and Liquori.

The landmark case on the public policy exception is *Petermann v. International Brotherhood of Teamsters*, 174 Cal. App.2d 184, 344 P.2d 25 (1959). Plaintiff in *Petermann* alleged a discharge for failing to commit perjury before a legislative committee, contrary to his employer's instructions. The District Court of Appeal, after noting that the term "public policy" may comprehend "that which has a tendency to be injurious to the public or against the public good" and "whatever contravenes good morals or any established interests of society," held that since both the commission and subornation of perjury were unlawful,

> in order to more fully effectuate the state's declared policy against perjury, the civil law, too, must deny the employer his generally unlimited right to discharge an employee whose employment is for an unspecified duration, when the reason for the dismissal is the employee's refusal to commit perjury.... The public policy of this state as reflected in the penal code ... would be seriously impaired if it were to be held that one could be discharged by reason of his refusal to commit perjury.

*Id.* at 189, 344 P.2d at 27.

Similarly, the Supreme Court of Indiana, in *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973), recognized and applied the public policy exception when an employee was retaliatorily discharged for filing a workmen's compensation claim. The court found that such a discharge would undermine the act's stated policy of transferring the economic burden of employment-related injuries from the employee to the employer, and would also contravene another statutory provision mandating that "[n]o contract or agreement, written or implied . . . or *other device* shall, in any manner, operate to relieve any employer in whole or in part of any obligation created by this act." *Id.* at 252, 297 N.E.2d at 428 (emphasis of the court).[11]

---

[11] For other cases employing the public policy exception where an employee was discharged for filing a workmen's compensation claim, see, Kelsay v. Motorola, Inc., 74 Ill.2d 172, 384 N.E.2d 353 (1979); Leach v. Lauhoff Grain Co., 51 Ill. App.3d 1022, 366 N.E.2d 1145 (1977); Brown v. Transcon Lines, 284 Or. 597, 588 P.2d 1087 (1978).

Several courts which have embraced the public policy exception have similarly discerned the relevant public policy from a statute which particularly addressed the employment relationship in some manner or defined (or from which could readily be inferred) the societal interest at stake.[12] In view of the somewhat vague meaning of the term "public policy,"[13] few courts have been inclined to apply the public policy exception absent a violation of statute or clearly defined policy.[14] These decisions manifest a reluctance of courts to unjustifiably intrude on the employment arrangement or to arrogate to themselves the perceived legislative function of declaring public policy.

Because the courts are a proper forum for modification of the judicially created at-will doctrine,[15] it is appropriate that we correct inequities resulting from harsh application of the doctrine by recognizing its inapplicability in a narrow class of cases. The public policy exception discussed herein represents wise and progressive social policy which both addresses the need for greater job security and

---

[12] *See, e.g.,* cases cited at note 8 *spura* and Perks v. Firestone Tire & Rubber Co., 611 F.2d 1363 (3rd Cir. 1979) (discharge for refusal to take polygraph test, where statute forbade employers from requiring same); Tameny v. Atlantic Richfield Co., 27 Cal.3d 167, 164 Cal. Rptr. 839, 610 P.2d 1330 (1980) (refusal to participate in price-fixing scheme); Montalvo v. Zamora, 7 Cal. App.3d 69, 86 Cal. Rptr. 401 (1970) (designating an attorney to represent plaintiff-employee in wage negotiations); Glenn v. Clearman's Golden Cock Inn, 192 Cal. App.2d 793, 13 Cal. Rptr. 769 (1961) (engaging in union activity).

[13] The court in Leach v. Lauhoff Grain Co., *supra* note 11, for example, said that public policy was that which "had a tendency to be injurious to the public, or against the public good"; that which "relates to good morals, natural justice and matters affecting the citizens of the state generally; or that which is found embodied in the state's constitution, its statutes or, when those are silent on the subject, in the decisions of its courts. 51 Ill. App.3d at 1024, 366 N.E.2d at 1147.

[14] *See, e.g.,* Larsen v. Motor Supply Co., 117 Ariz. 507, 573 P.2d 907 (1977) (refusal to take lie detector tests mandated by company); Becket v. Welton Becket & Associates, 39 Cal. App.3d 815, 114 Cal. Rptr. 531 (1974) (filing derivative suit); Jackson v. Minidoka, 98 Idaho 330, 563 P.2d 54 (1977) (discharge for unwitting participation in conversion of public corporation's funds); Rozier v. St. Mary's Hospital, 88 Ill. App.3d 994, 411 N.E.2d 50 (1980) (leaking information to press about hospital employees' conduct toward patients); Geary v. United States Steel Corp., 456 Pa. 171, 319 A.2d 174 (1974) (communicating the unsafe nature of employer's products to superiors).

[15] *Protecting At Will Employees, supra* note 3, at 1838.

preserves to the employer sufficient latitude to maintain profitable and efficient business operations. We therefore hold that an employer may be held liable in tort where his discharge of an employee violates a clear mandate of public policy.[16] In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject. Of course, the plaintiff alleging a retaliatory discharge bears the burden of proving that the discharge violates a clear mandate of public policy.

In the instant case, we easily discern the relevant public policy from the antitrust laws. The notion that it is the purpose of those laws to protect the public interest in free and unrestrained competition is too well-established to require citation. In fact, section 4 of the Clayton Act[17] was created by Congress to encourage individuals to challenge antitrust violations, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 n.10 (1977), and has been construed to provide a treble damage remedy for an employee discharged for refusing to participate in an illegal price-fixing scheme. *McNulty v. Borden, Inc.*, 474 F. Supp. 1111, (E.D. Pa. 1979). *See also Ostrofe v. H. S. Crocker Co., Inc.*, 670 F.2d 1378 (9th Cir. 1982). These authorities amply evidence that a retaliatory discharge in apparent furtherance of antitrust violations contravenes public policy.

Applying the rule we adopt today, we hold that the trial court erred in granting summary judgment as to Count I. The court erroneously rejected the notion that appellant's discharge might contravene public policy and found no trial-worthy issue of material fact.

---

[16] We do not reach the issue whether a wrongful discharge gives rise to a cause of action for the intentional infliction of emotional distress. *See* Agis v. Howard Johnson Co., 371 Mass. 140, 355 N.E.2d 315 (1976).

[17] Sec. 4 of the Clayton Act, codified at 15 U.S.C. § 15 (1914), provides, in pertinent part:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor

Viewing the inferences to be drawn from the materials before the court on appellees' motion for summary judgment in the light most favorable to Parnar as we must on a motion for summary judgment, *Gum v. Nakamura,* 57 Haw. 39, 42, 549 P.2d 471, 474 (1976); *Technicolor, Inc. v. Traeger,* 57 Haw. 113, 118, 551 P.2d 163, 168 (1976), we think there was sufficient dispute to create a question in the mind of the trier as to the existence of the motivation for Parnar's discharge.[18] That appellees asserted a plausible and legitimate reason for Parnar's discharge should not, in any case, have barred the action from proceeding to trial for the jury's determination of the factual issue of motivation which, in any action for retaliatory discharge, is always material. Summary judgment under these circumstances was therefore improper since, as stated many times by this court, summary judgment is proper only where there is no genuine issue as to any material fact and the movants clearly indicate they are entitled to judgment as a matter of law. *Molokai Homesteaders Coop. Assn. v. Cobb,* 63 Haw. 453, 458, 629 P.2d 1134, 1139 (1981); *City and County v. Toyama,* 61 Haw. 156, 158, 598 P.2d

---

[18] The motivation for Parnar's discharge was seriously cast in doubt by the materials before the lower court. Parnar alleged the following facts: (1) that immediately following her meeting with Van Etten, Liquori called her into his office, told her he had wanted to be present at the meeting to prevent her from saying anything to hurt the hotel, and had tried to make statements on her behalf but "they wouldn't let us"; (2) that on the following day Liquori told her she might be called as a witness before the grand jury, that her testimony might cause the hotel to be heavily fined, that Liquori's superior, Charles Bogdahn, could lose his job, that she appealed her termination to Bogdahn, who said he would discuss it with Liquori and get back to her but did not; (3) that the deposition of Thomas Evans, a former sales director of the Ala Moana Hotel, who was present at a conversation between Liquori and Bogdahn in which Parnar's exchange of rate information was discussed indicated that while the men did not discuss her termination "there was no question but that the indication was that she was a liability to the hotel," and that this conversation took place at a time when the hotel was trying to prepare a defense to possible antitrust prosecution. Appellees assert that the inference that they would take retaliatory action against Parnar for speaking with their own counsel is absurd and "illogical." We can only say, however, that Liquori's statements to Parnar, if true, belie such a cavalier attitude.

Furthermore, Liquori stated in affidavit and deposition that there was a personality conflict that made it impossible to work with Parnar. The release form authorized by him, however, stated that she was "unable to do a satisfactory job." Parnar stated by affidavit that on the effective date of discharge Liquori told her that her work was satisfactory. By deposition, Parnar stated that she and Liquori had a good professional relationship and that on the date of her discharge Liquori admitted that the antitrust investigation was "partly" the cause of her termination.

168, 170-71 (1979); *Hunt v. Chang*, 60 Haw. 608, 618, 594 P.2d 118, 124 (1979).

We, therefore, reverse the lower court's judgment as to Count I and remand for further proceedings consistent with this opinion. Parnar has sufficiently alleged a retaliatory discharge in contravention of public policy such that she should be allowed to proceed against the appellees individually. Appellees are not thereby prejudiced where the gist of this action has at all times been a retaliatory discharge.

Parnar's contentions regarding Counts II through VI are, however, without merit. Accordingly, we affirm the lower court's grant of summary judgment as to those counts.

*Susan M. Ichinose (Mukai, Ichiki, Raffetto & MacMillan)* for appellant.

*Burnham H. Greeley* and *Dan T. Kochi (Carlsmith, Carlsmith, Wichman & Case)* and *Roy A. Vitousek (Cades, Schutte, Fleming & Wright)* for appellees.