**GRANT T. NORRIS**, Plaintiff–Appellant, v. **HAWAIIAN AIRLINES, INC.**, Defendant–Appellee

(CIV. NO. 87–3894–12)

and

**GRANT T. NORRIS**, Plaintiff–Appellant, v. **PAUL J. FINAZZO, HOWARD E. OGDEN, HATSUO HONMA**, and **JOHN DOES 1–50**, Defendants–Appellees

(CIV. NO. 89–2904–09)

NO. 15022

DECEMBER 16, 1992

LUM, C.J., HAYASHI,* WAKATSUKI,** AND MOON, JJ., AND INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS, IN PLACE OF PADGETT, J., RECUSED

---

*Associate Justice Hayashi, who heard oral argument, retired from the court on March 29, 1992. *See* HRS § 602–10 (1985).

**Associate Justice Wakatsuki, who heard oral argument, passed away on September 22, 1992. *See* HRS § 602–10 (1985).

## OPINION OF THE COURT BY MOON, J.

Plaintiff–appellant Grant T. Norris (Norris) appeals from the final judgment of the Circuit Court of the First Circuit, which was certified as final, pursuant to Hawaii Rules of Civil Procedure (HRCP) Rule 54(b), and entered in favor of defendants–appellees Paul J. Finazzo, Howard E. Ogden, and Hatsuo Honma (collectively, defendants). Norris had filed suit against defendants alleging discharge from his employment in violation of public policy. The circuit court granted defendants' motion to dismiss counts I and II of Norris' complaint for lack of subject matter jurisdiction on the ground that Norris' claims were preempted by the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188 (1988). We disagree with the circuit court's determination and hold that the RLA does not preempt Norris' state tort claims. Therefore, we reverse the order of the circuit court dismissing counts I and II of Norris' complaint and vacate the final judgment entered by the circuit court.

## I. **STANDARD OF REVIEW**

Defendants moved to dismiss counts I and II of Norris' complaint based on lack of subject matter jurisdiction, pursuant to HRCP Rules 12(b)(1) and 12(h)(3).[1] A trial court's dismissal for lack of subject matter jurisdiction is a question of law, reviewable *de novo*. *McCarthy v. United*

---

[1] HRCP Rule 12(b)(1) provides in pertinent part that "[e]very defense . . . shall be asserted in the responsive pleading . . . except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter[.]"

HRCP Rule 12(h)(3) provides: "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."

*States*, 850 F.2d 558, 560 (9th Cir. 1988), *cert. denied*, 489 U.S. 1052 (1989); *see also **Moir v. Greater Cleveland Regional Transit Auth.***, 895 F.2d 266, 269 (6th Cir. 1990). Moreover, we adopt the view of the Ninth Circuit Court of Appeals in ***Love v. United States***, 871 F.2d 1488 (9th Cir. 1989), *opinion amended on other grounds and superseded by **Love v. United States***, 915 F.2d 1242 (9th Cir. 1989):

> Our review [of a motion to dismiss for lack of subject matter jurisdiction] is based on the contents of the complaint, the allegations of which we accept as true and construe in the light most favorable to the plaintiff. Dismissal is improper unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Id.* at 1491 (citations omitted). However, "when considering a motion to dismiss pursuant to Rule 12(b)(1) the [trial] court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." ***McCarthy***, 850 F.2d at 560 (citations omitted); *see also* 5A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350, at 213 (1990). Therefore, based on the applicable standard of review, we set forth the facts below as alleged by Norris in his complaint and in the materials presented to the trial court outside the pleadings.[2]

## II. **FACTS**

Norris, an aircraft mechanic licensed by the Federal Aviation Administration (FAA), was employed by

---

[2] Our review of the record reveals that attached to defendants' Motion to Dismiss Counts I and II For Lack of Subject Matter Jurisdic-

Hawaiian Airlines, Inc. (HAL) from February 2, 1987 to August 3, 1987. Norris' FAA license carried a rating that gave him the authority to approve and return an aircraft to service after he had made, supervised, or inspected certain repairs performed on the aircraft. *See* Certification: Airmen Other Than Flight Crewmembers, 14 C.F.R §§ 65.85, 65.87 (1987). Norris, however, was not allowed to approve and return to service any aircraft or aircraft parts to which repairs had been made that did not conform to the applicable Federal Aviation Regulations (FAR). Any fraudulent entry by a mechanic in any record or report required by the FAR is cause for the FAA to suspend or revoke the mechanic's FAA license. *See* Maintenance, Preventive Maintenance, Rebuilding, and Alteration, 14 C.F.R. § 43.12 (1992).

On July 15, 1987,[3] Norris was conducting a routine preflight inspection on one of HAL's DC–9 aircraft when he noticed that one of the main landing gear tires was worn. When the tire and bearing were removed, Norris and the other mechanics present observed that the axle sleeve, which normally has a mirror–smooth surface, was scarred and grooved, with gouges and burn marks clearly visible.[4] Norris and the other mechanics believed that the part was unsafe and should be replaced. However, Norris' supervisor, Justin Culahara (Culahara), ordered the

---

tion and the various memoranda filed by the parties in support of or in opposition to the motion were a number of exhibits which the trial court considered in ruling on the subject motion.

[3] According to Norris' complaint, he was assigned to inspect the aircraft in question on July "14," 1987, but "punched out on July 15, 1987."

[4] Such damage may cause the sleeve to rub against the wheel bearing and, in turn, may cause the bearing or entire landing gear to fail.

mechanics to sand the axle sleeve by hand and put a new bearing and tire over it. The repairs were performed in accordance with Culahara's orders, and the aircraft made its scheduled flight.

When Norris was about to leave at the end of his shift, Culahara ordered Norris to "sign off" the maintenance record for the installation of the tire, which under the applicable FAR operated as a certification by Norris that the repair had been performed satisfactorily and the aircraft was fit for return to service. Norris refused, explaining that the sleeve was unsafe. He indicated that he would sign off if Culahara "could show [Norris] in the [McDonnell Douglas] manual where it said that the axle was in satisfactory condition." Culahara informed Norris that if he did not sign the maintenance record, he (Norris) would be fired. Norris refused to sign off and was immediately suspended pending a termination hearing. Norris left the premises, and when he returned home, he called the FAA to report that there was a problem with an HAL aircraft that he had serviced. The FAA official advised Norris that the FAA would look into the matter.

Following his suspension, Norris invoked the grievance procedure outlined in the collective bargaining agreement (CBA), which governed the terms and conditions of his employment. The agreement was entered into between Norris' union, the International Association of Machinists, and HAL, pursuant to the provisions of the RLA. The CBA provides that an employee may be disciplined or discharged only for just cause. It also states that an employee's refusal to perform work in violation of health and safety law "shall not warrant disciplinary action."

Norris' termination hearing was held on July 31, 1987, which resulted in his termination for "insubordina-

tion" on August 3, 1987.[5] After he was terminated, Norris contacted the FAA and gave them the details of what happened on July 15, 1987. On August 4, 1987, the FAA seized the axle sleeve and began a comprehensive investigation into the length of time the sleeve had been on the aircraft and the number of times the sleeve had been signed off while damaged. In September 1987, the FAA broadened its investigation to include other HAL DC–9 aircraft. Defendants state in their answering brief:

> While it is true that the FAA initially charged HAL with violation of Federal Aviation Regulations regarding the condition of the axle sleeve on August 4, 1987, the FAA made no findings of fact in that charge, and the charge was ultimately dismissed by the FAA with no findings of fact or conclusions of law having been made.

Following his termination, Norris filed a grievance seeking reinstatement and back pay. Norris' union representative referred the grievance for a "Step 3" hearing[6] pursuant to the CBA. However, before the hearing was conducted, HAL's Vice–President of Maintenance and Engineering, Howard E. Ogden (Ogden), offered to "mitigate" Norris' punishment to suspension without pay for the period August 3, 1987 to September 15, 1987. Ogden warned Norris by letter that "any further instance of failure to perform [his] duties in a responsible manner"

---

[5] Culahara's supervisor, Norman Matsutaki, Assistant Director of Base Management, presided over the termination proceedings as hearings officer.

[6] Under Article XV, paragraph B. 3. of the CBA, the Step 3 hearing process is an appeal "to the Department Head under whose jurisdiction the employee works."

could result in his being discharged. Norris did not respond to HAL regarding the reinstatement offer, but filed suit against HAL in circuit court on December 8, 1987.[7]

On September 20, 1989, Norris filed this action against defendants Paul Finazzo, who at the time of Norris' termination was president of HAL, Ogden, and Hatsuo Honma, HAL's Director of Base Manage-

---

[7] HAL removed the case to the United States District Court on January 6, 1988. The district court determined that Count V of Norris' complaint, which alleged a claim for breach of the CBA, was completely preempted by the RLA and dismissed it because Norris had failed to exhaust his remedies under the CBA. The district court found the remaining claims to be within its discretionary pendent jurisdiction, but chose not to hear the claims and remanded the case to state court. Norris' complaint against HAL, identified as Civil No. 87–3894, is not at issue on this appeal because the circuit court's order and judgment entered in that case were vacated by this court due to lack of jurisdiction following removal from federal court. We stated:

> Upon review of the record it appears Civil No. 87–3894 [Norris v. HAL] was removed to federal court under 28 U.S.C. § 1446. It further appears that there is no certified order of remand in the record as required by 28 U.S.C. § 1447(c) for the state court to proceed with the case. Thus, the circuit court lacked jurisdiction and its orders and judgment in Civil No. 87–3894 must be vacated. *See, e.g.* 14A Wright, Miller, & Cooper, *Federal Practice & Procedure* § 3737 (West, 1985).

> IT IS HEREBY ORDERED the circuit court's judgment dismissing Count I of the Complaint in Civil No. 87–3894 is vacated and the appeal from the HRCP 54(b) certified orders and judgment in Civil No. 87–3894 is dismissed.

> IT IS FURTHER ORDERED the appeal from the HRCP 54(b) certified order and judgment in Civil No. 89–2904 [Norris v. Finazzo] is properly before the court and shall proceed without additional briefing.

*Norris v. Hawaiian Airlines, Inc.*, No. 15022 (Haw. July 24, 1991) (order of partial dismissal).

ment.[8]   Norris' complaint alleges that defendants "directed, confirmed or ratified" the acts of HAL's employees resulting in his discharge in violation of public policy as articulated in the Federal Aviation Act and the FAR (count I), and in the Hawaii Whistleblowers' Protection Act (HWPA), Hawaii Revised Statutes (HRS) §§ 378–61 through –69 (Supp. 1991) (count II).[9]   On October 22, 1990, the circuit court concluded that the RLA preempted Norris' state tort claims and therefore dismissed counts I and II for lack of subject matter jurisdiction.  The circuit court certified the dismissals as final pursuant to HRCP 54(b), and this timely appeal followed.

## III.  DISCUSSION

We first address whether the RLA preempts Norris' claims for discharge in violation of public policy.  Because we conclude it does not, we next address whether the state tort claim as alleged by Norris exists under Hawaii law.

### A.  Preemption Issue

"Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law, when there is outright or actual conflict between federal and state law."  *Louisiana Public Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (1986).  Whether a state law estab-

---

[8] Norris' complaint names individual representatives authorized to act on behalf of HAL, but does not name HAL.  Moreover, the complaint does not allege that the individual defendants were acting outside the scope of their authority.  Thus, because a corporation can act only through its authorized representatives, for purposes of this opinion, references to "employer" (HAL) are synonymous with the named defendants.

[9] The remaining counts in Norris' complaint are not at issue on this appeal.

lishing a cause of action is preempted in a given case is a question of congressional intent. *See Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985).

The RLA was enacted to promote stability in labor–management relations by providing a comprehensive framework for resolving labor disputes in the railroad industry, *Atchison, Topeka & Sante Fe Railway Co. v. Buell*, 480 U.S. 557, 562 (1987), and was extended to the airline industry pursuant to 45 U.S.C. § 184 (1988). The purposes of the RLA are to provide for, among other things,

> the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions [and] . . . the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

45 U.S.C. § 151(a).

The United States Supreme Court in *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299 (1989), was called upon to examine the "two classes of controversy Congress had distinguished in the RLA." *Id.* at 302. These two classes of controversy were "regarded traditionally as the major and the minor disputes of the railway labor world." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945). However, because the Court had not previously "articulated an explicit standard for differentiating between major and minor disputes[,]" *Consolidated Rail*, 491 U.S. at 302, the Court in *Consolidated Rail* was compelled to do so.

A "major" dispute

> relates to disputes over the formation of collective agreements or efforts to secure them. They arise

> where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

*Id.* (citing *Burley*, 325 U.S. at 723). Parties involved in major disputes are required "to undergo a lengthy process of bargaining and mediation[,] [u]ntil they have exhausted those procedures[.] . . . Once this protracted process ends and no agreement has been reached, the parties may resort to the use of economic force." *Id.* at 302–03 (citations omitted).

A "minor" dispute, on the other hand,

> contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. . . . [T]he claim is to rights accrued, not merely to have new ones created for the future.

*Id.* at 303 (citing *Burley*, 325 U.S. at 723). Mandatory arbitration is the exclusive remedy for claims arising from minor disputes. *See id.* at 303–04; *see also* **Andrews v. Louisville & Nashville R.R.**, 406 U.S. 320, 322–23 (1972).

The mandatory arbitration provision of the RLA provides:

> The disputes between an employee or group of employees and a carrier or carriers *growing out of grievances or out of the interpretation or*

*application of agreements concerning rates of pay, rules, or working conditions,* including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

45 U.S.C. § 153 First (i) (emphasis added).

Although the RLA provides a compulsory and binding arbitral system comprised of a National Railroad Adjustment Board, *see* 45 U.S.C. § 153 First, there is no national adjustment board in the airline industry; minor disputes are resolved by adjustment boards established by the airlines and the unions. *See Consolidated Rail*, 491 U.S. at 304 n.4. The decision of an adjustment board is final and binding. 45 U.S.C. § 153 First (m).

The parties in this case agree that Norris' claims do not give rise to a "major" dispute. The question then is whether Norris' claims may be deemed "minor," thereby preempting his state tort action and requiring him to submit to mandatory arbitration pursuant to the RLA.

Defendants contend that Norris' claims "constitute a 'dispute between [a] carrier and [an] employee' within the meaning of 45 U.S.C. § 152 First [and therefore conclude that] it shall be the duty of 'all carriers, *their officers, agents and employees* . . . to settle all disputes, whether arising out of the application of [collective bargaining] agreements, or otherwise[.]' " (Emphasis in original.) This court in *Puchert v. Agsalud*, 67 Haw. 25, 677 P.2d

449 (1984), *appeal dismissed for want of substantial federal question*, 472 U.S. 1001 (1985), examined the scope of the RLA preemption as it applied to airline employee Puchert's complaint of discharge from employment in violation of HRS § 378–32(2) of the HWPA for filing a workers' compensation claim. We noted that

[c]ases holding that state law claims are pre—empted by the RLA are clearly distinguishable.[10] The complaints filed in those cases constituted state law claims that were non–existent but for the collective bargaining agreement which provided remedies for such claims, or the state law claims were identical to the contractual claims provided for in the collective bargaining agreement.

---

[10] The following cases cited in *Puchert* are relied upon by defendants in this case:

*Andrew[s] v. Louisville and Nashville R.R. Co.*, [406 U.S. 320 (1972)] (state law claim of unlawful discharge depended solely on contract right not to be discharged); *Schroeder v. Trans World Airlines, Inc.*, [702 F.2d 189 (9th Cir. 1983)] (complaint of unlawful business practices in violation of California statutes was actually a complaint of wrongful demotion under the collective bargaining contract); *Beers v. Southern Pacific Transportation Co.*, 703 F.2d 425 (9th Cir. 1983) (complaints alleging intentional infliction of emotional distress referred to rights covered or substantially related to the collective bargaining agreement); *Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367 (9th Cir.), *cert. denied*, 439 U.S. 930 (1978) (emotional distress incident to discharge from employment rather than result of alleged conspiracy); *Jackson v. Consolidated Rail Corp.*, 717 F.2d 1045 (7th Cir. 1983), *cert. denied*, 465 U.S. 1007 (1984) (state claim raised identical to claim employee would have made had he pursued his grievance through channels specified in the collective bargaining agreement).

*Puchert*, 67 Haw. at 29–30, 677 P.2d at 454.

*Id.* at 29, 677 P.2d at 454 (citations omitted) (footnote added). We held that Puchert's complaint was not a "minor dispute" subject to mandatory arbitration under the RLA because

> *[t]he resolution of the dispute . . . does not hinge on the application or interpretation of the collective bargaining agreement* between Pan Am and Puchert's union. Puchert complains of a violation of his right not to be discharged from his employment solely because he suffered from a work injury compensable under the state's worker's compensation law. *This right finds its source not in the collective bargaining agreement between Pan Am and Puchert's union, but in the statute.*

*Id.* at 30, 677 P.2d at 454 (emphasis added) (citation omitted).

Although a "minor" dispute contemplates the existence of a CBA, the term "grievances" as used in the mandatory arbitration provision of the RLA, could arguably be ambiguous and may be literally read to include disputes arising outside a CBA. However, the United States Supreme Court clearly determined otherwise in *Consolidated Rail.* The Court stated that "minor" disputes, to which § 153 First (i) applies, are those that "may be conclusively resolved by interpreting the existing [collective bargaining] agreement." 491 U.S. at 305 (citation omitted). The Court also stated that "[w]here an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective–bargaining agreement." *Id.* at 307. The Supreme Court's interpretation of the RLA's mandatory arbitration provision demonstrates its belief that Congress intended to affect only those disputes involving contractually defined rights.

Moreover, the plain language of § 153 First (i) does not support preemption of disputes independent of a labor agreement.

In determining the RLA's scope of preemption, Norris asserts that the United States Supreme Court cases reviewing preemption under the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 141–188, are analogous. Defendants, on the other hand, contend that such cases are inapposite to this case because preemption under the RLA is broader than under § 301 of the LMRA. We note that although all parallels between the RLA and the LMRA must be drawn "with utmost care," *Chicago & N.W. Railway Co. v. United Transportation Union*, 402 U.S. 570, 579 n.11 (1971), the Supreme Court has relied upon the "common law" of labor relations developed under the LMRA for assistance in construing the RLA. *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383–84 (1969).[11] *See also Puchert*, 67 Haw. at 32, 677 P.2d at 455 ("courts have [also] applied standards adopted in NLRA pre–emption cases to [Railway Labor Act] cases").

The United States Supreme Court has stated:

> Of course, not every dispute concerning employment, or tangentially involving a provision of a collective–bargaining agreement, is preempted

---

[11] In *Brotherhood of R.R. Trainmen*, the Court stated: "The Court has in the past referred to the [National Labor Relations Act (NLRA)] for assistance in construing the Railway Labor Act[.]" For purposes of this discussion, the NLRA, 29 U.S.C. §§ 151–187 (1988), is essentially equivalent to the LMRA because "the Labor–Management Relations Act, 1947, includes as its subchapter II the National Labor Relations Act of 1935 as amended by the Labor–Management Relations Act of 1947." 48 AM. JUR. 2D, *Labor and Labor Relations*, § 546 (1979) (footnote omitted).

by § 301 *or other provisions of the federal
labor law* .... Such rule of law would delegate to
unions and unionized employers the power to
exempt themselves from whatever state labor
standards they disfavored. Clearly, § 301 does not
grant the parties to a collective–bargaining agree-
ment the ability to contract for what is illegal
under state law. In extending the preemptive
effect of § 301 beyond suits for breach of contract,
it would be inconsistent with congressional intent
under that section to pre–empt state rules that
proscribe conduct, or establish rights and obliga-
tions, independent of a labor contract.

*Allis–Chalmers Corp.*, 471 U.S. at 211–12 (emphasis added).

In *Lingle v. Norge Division of Magic Chef, Inc.*,
486 U.S. 399 (1988), plaintiff was injured on the job and
filed a workers' compensation claim. Upon learning of the
claim, the employer fired plaintiff for filing an allegedly
false claim. Plaintiff filed a grievance, alleging that she
had been discharged without just cause in violation of the
CBA. While arbitration was proceeding, plaintiff filed a
retaliatory discharge action in Illinois state court con-
tending that she had been discharged for exercising her
rights under Illinois' workers' compensation laws. The
employer contended that the state law tort action was
preempted by provisions of the CBA. The federal trial and
appeal courts agreed and dismissed the action. *See
Lingle v. Norge Div. of Magic Chef, Inc.*, 618 F. Supp.
1448 (S.D. Ill. 1985); *Lingle v. Norge Div. of Magic
Chef, Inc.*, 823 F.2d 1031 (7th Cir. 1987). The Supreme
Court reversed, holding that application of state law is
preempted by § 301 of the LMRA only if the application
requires the interpretation of a CBA. Examining Illinois

law and the CBA at issue, the Supreme Court reasoned that in order

> to show retaliatory discharge, the plaintiff must set forth sufficient facts from which it can be inferred that (1) he was discharged or threatened with discharge and (2) the employer's motive in discharging or threatening to discharge him was to deter him from exercising his rights under [Illinois Workers' Compensation] Act or to interfere with his exercise of those rights. Each of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer. *Neither of the elements requires a court to interpret any term of a collective–bargaining agreement.* To defend against a retaliatory discharge claim, an employer must show that it had a nonretaliatory reason for the discharge; this purely factual inquiry likewise does not turn on the meaning of any provision of a collective–bargaining agreement. *Thus, the state–law remedy in this case is "independent" of the collective–bargaining agreement in the sense of "independent" that matters for [LMRA] § 301 preemption purposes: resolution of the state–law claim does not require construing the collective–bargaining agreement.*

*Lingle*, 486 U.S. at 407 (citations omitted) (emphasis added).

In *Maher v. New Jersey Transit Rail Operations, Inc.*, 125 N.J. 455, 593 A.2d 750 (1991), the New Jersey Supreme Court determined that plaintiff's claim of retaliatory discharge, based on New Jersey's Whistleblower statute, was not preempted by the RLA. In its analysis,

the New Jersey court rejected the employer's argument that § 301 of the LMRA has "less preemptive force" than the RLA. *Id.* at 472, 593 A.2d at 759. The court explained:

> When a collective–bargaining agreement subject to the [LMRA] establishes a grievance and arbitration remedy, that remedy preempts state–law–based claims by force of section 301. That preemptive effect is no different from that granted to the arbitral remedies established by the [RLA]. Preemption becomes a dominant consideration under both statutes when the arbitration process can be disrupted or when the uniformity of national law is threatened by a state claim that must be vindicated through outside interpretation of a collective–bargaining agreement.

*Id.* at 472–73, 593 A.2d at 759 (citations omitted). Persuaded by the analysis of the courts in *Lingle* and *Maher*, we agree with Norris that LMRA preemption cases are analogous, and thus, may provide guidance in determining the scope of preemption under the RLA.

In *Lingle*, the Supreme Court held that application of state law is preempted by the LMRA only if the application is dependent on the interpretation of a collective bargaining agreement. That holding is virtually indistinguishable from the Supreme Court's reading of § 153 First (i) of the RLA in *Consolidated Rail* and is also consistent with this court's interpretation in *Puchert*. We conclude that Congress intended the mandatory arbitration provision of the RLA be confined to the same limits the Supreme Court applied to the LMRA in *Lingle*.

In *Maher*, defendant New Jersey Transit Rail Operations (NJT) argued, as do the defendants in this case, that *Consolidated Rail* provides that a disagreement over an

employer's action is a minor dispute if the contested action is "arguably justified by the terms of the parties' [CBA]." The New Jersey Supreme Court noted that this test, articulated in *Consolidated Rail,* was not controlling in *Maher* because the standard was adopted in order to determine whether a disagreement was a *major dispute* or a *minor dispute.*

The New Jersey court noted:

> The danger with indiscriminate use of the "arguably justified" standard in distinguishing between minor disputes and complaints that do not implicate the Railway Labor Act is that it enables a railway "simply [to] hide behind the arbitration provisions of a collective bargaining agreement to bypass [its] employees' statutory right[s]."

*Maher*, 125 N.J. at 470, 593 A.2d at 758 (citation omitted).

However, the New Jersey court explained that even when considering the "arguably justified" test, Maher's whistleblower–based claim was not preempted by the RLA. The court stated:

> The key to this puzzle lies in the nature of the "disputed action.". . . The nub of the disputed action, then, is not that Maher was discharged, which "arguably" would be covered by the "just–cause" provision of the collective–bargaining agreement, but that he was discharged in retaliation for having reported violations of the law. The pertinent question is whether the collective–bargaining agreement addresses NJT's alleged conduct.
>
> Although NJT's burden is "relatively light" in showing that the agreement brings Maher's claim

within the exclusive jurisdiction of the Adjustment Boards, the employer has not met that minimal standard. NJT has not suggested (the suggestion would be "obviously insubstantial") that a retaliatory discharge is "sanctioned" or "justified" by a provision in the agreement. It can point to no part of the collective–bargaining agreement that demonstrates that the carrier and the union have agreed on standards relevant to Maher's situation. Maher's claim of retaliatory discharge does not in any way turn on an interpretation of the just–cause–discharge clause or any other clause in the agreement.

*Id.* at 470–71, 593 A.2d at 758 (citation omitted).

In this case, defendants argue that Articles IV and XVII of the CBA require interpretation in order to determine Norris' claim of retaliatory discharge. Article IV, paragraph D. 4(a)., provides that an aircraft mechanic "may be required to sign work records in connection with the work he performs." Defendants point to Culahara's (Norris' supervisor) deposition which indicates that he told Norris that he was not asking that Norris sign off for the condition of the axle sleeve, but to sign off for the tire change in which Norris participated. On these facts, defendants assert that

Norris' "wrongful discharge" claim will require interpretation of Article IV of the CBA because HAL could certainly legitimately discipline Norris for refusing to sign a work record if the work record did not cover the axle sleeve and if Norris could have noted his objections to the condition of the axle sleeve on any work record tendered to him for signature. *See Consolidated Rail Corp. v. Railway Labor Execs Assn.*, 491 U.S. 299,

307 (1989) (If an RLA employer asserts a contractual right to take an action contested by employees, the controversy is subject to the RLA's grievance/arbitration procedures if the employer's action is "arguably justified" by the terms of the collective bargaining agreement)[.]

We disagree. As in *Maher*, Norris' retaliatory discharge claim is based on his allegation that he was terminated for reporting a violation of the law, and defendants do not suggest that a retaliatory discharge is sanctioned or justified by a provision in the agreement nor do they point to any part of the CBA which demonstrates that the carrier and union have agreed on standards relevant to Norris' situation. Although defendants' defense is that Norris was terminated for insubordination, and thus "just cause," for not signing off on the work order, the respective positions of the parties to be presented at trial are, as noted in *Lingle*, "purely factual questions [which] pertain[] to the conduct of the employee and the conduct and motivation of the employer. Neither of [the parties' positions] requires a court to interpret any term of a collective bargaining agreement."[12] *Lingle*, 486 U.S. at 407.

Defendants also argue that Article XVII of the CBA which protects employees from discipline for refusing to perform work in violation of state or federal health and safety laws, would have to be interpreted to determine if HAL acted "wrongfully" by initiating disciplinary action against Norris for refusal to sign off the work record. "The

---

[12] Defendants also claim that Norris was merely suspended rather than terminated, which is also a factual issue to be determined by the trier of fact and is not dependent on the interpretation of any provision of the CBA.

issue of safety in the workplace is a commonplace issue for arbitrators to consider in discharge cases[.]" *United Paper Workers International Union v. Misco, Inc.*, 484 U.S. 29, 44 n.11 (1987).

However, the issue raised by Norris is not one of safety in the "workplace" for the benefit of the employees, but is focused on the public policy of protecting the safety of the flying public. As Norris points out,

> Article XVII never refers to the safety of the public, which Norris was trying to protect. Instead, it refers, for example, to physical examinations for employees, to clean and dry washroom floors, to lights, to employee lockers, to unsafe and unsanitary working conditions, to protective apparel for employees, to rain repellent garments and boots for employees, to ear muffs, and to safety goggles.

We conclude that Norris' claim for retaliatory discharge is not dependent on an interpretation of Articles IV or XVII of the CBA or any other provision of the CBA. Consequently, Norris' claims are not preempted under the RLA.

## B. Norris' State Tort Claims
### 1.

Defendants also argue that, even if Norris' claims are not preempted under the RLA, counts I and II, which are based on violations of public policies, do not state a claim arising under Hawaii law. Initially, we note that defendants do not deny the existence of the public policies relied upon by Norris under the Federal Aviation Act, the FAR, and the HWPA. However, defendants contend that, under the holding of *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625 (1982), the state tort claim for

discharge in violation of public policy is limited to at–will employees and does not extend to unionized employees who are protected by a "mandatory grievance/arbitration procedure and just cause standard for termination" under the CBA. We disagree.

In *Parnar*, a non–union employee (Parnar) filed a complaint alleging retaliatory discharge against Americana Hotels, Inc., the managing partner of the Ala Moana Hotel in Honolulu, Flagship International, Inc., the operator of the hotel, and Mark E. Liquori, the hotel's controller who was Parnar's immediate supervisor. Parnar asserted that public policy was violated when she was discharged for giving truthful information about her employer's possible federal antitrust violations. We held "that an employer may be held liable in tort where his discharge of an employee violates a clear mandate of public policy." *Parnar*, 65 Haw. at 380, 652 P.2d at 631. This court determined that the relevant and clear public policy arising from the federal antitrust laws is to protect the public interest in free and unrestrained competition. We stated that "a retaliatory discharge in apparent furtherance of antitrust violations contravenes public policy." *Id.*

Defendants, however, maintain that Hawaii's public policy which "strongly favors upholding arbitration agreements" overrides the extension of *Parnar* to this case. Although we agree that Hawaii's public policy as reflected by our Arbitration and Award Statute, HRS chapter 658, strongly favors arbitration over litigation, the mere existence of an arbitration agreement does not mean that the parties must submit to an arbitrator disputes which are outside the scope of the arbitration agreement. *See* **Koolau Radiology, Inc. v. Queen's Medical Ctr.**, 73 Haw. 433, 834 P.2d 1294 (1992) (the arbitration agreement limited the scope of an arbitrator, a real estate

appraiser, to determine lease values and did not extend the arbitrator's authority to decide legal issues such as the statute of frauds or the parol evidence rule as related to an alleged oral agreement).

> The arbitral forum must be authorized and competent to resolve the dispute brought before it. "[A]rbitration is a continuation of the collective-bargaining process," and the role of the arbitrator is to interpret the labor contract and to apply the agreement to the facts of a dispute. On the other hand, the arbitrator "ordinarily cannot consider public interest, and does not determine violations of law or public policy."

*Maher*, 125 N.J. at 474, 593 A.2d at 760 (citations omitted).

In this case, there is no question that the relevant public policy of the Federal Aviation Act and the FAR is to protect the public from shoddy repair and maintenance practices in the aviation industry which may endanger the flying public. Moreover, we view the enactment of the HWPA by our legislature following the *Parnar* decision as a "clear mandate of public policy." *Parnar*, 65 Haw. at 380, 652 P.2d at 631. The HWPA provides in pertinent part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (1)  The employee . . . reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of a law or rule adopted pursuant to law of this State, a politi-

cal subdivision of this State, or the United States, unless the employee knows that the report is false[.]

HRS § 378–62(1) (Supp. 1991).

Our review of the legislative history of the HWPA reveals that the legislature intended to safeguard the general public by giving certain protections to individual employees who "blow the whistle" for the public good. *See* Senate Stand. Comm. Rep. No. 1127, 1987 Senate Journal, at 1391–92 ("providing protection to government employees and citizens who are willing to 'blow the whistle' when they are aware of ethical or other violations of law will help the State maintain high standards of ethical conduct."); *see also* Hse. Stand. Comm. Rep. No. 25, 1987 House Journal, at 1090. The legislature did not restrict such protections to at–will employees. On the contrary, it left open for the courts to further determine the development of the common law in retaliatory discharge cases:

Our [s]upreme [c]ourt has recently developed a common law tort for discharging an employee contrary to public policy in ***Parnar v. Ala Moana Americana Hotels, Inc.***, 65 Haw. 370 (1982). The scope of this newly created right, the remedies which are allowed, and the procedures which are applicable have not been judicially determined. Your Committee does not believe that the Legislature should stifle or restrict the developing common law. Therefore, *a new section was added to provide that the statutory rights of action created herein are not to be construed to limit the development of the common law or as a legislative preemption of the common law on practices sought to be prohibited by this Act.*

*Id.* (emphasis added).

Furthermore, we note that the legislature contemplated the potential conflict between union and non-union employees by specifically providing that "[w]here a collective bargaining agreement provides inferior rights and remedies to those provided in [the HWPA], the provisions of [the HWPA] shall supersede and take precedence over the rights, remedies, and procedures provided in collective bargaining agreements." HRS § 378-66(b) (Supp. 1991).

Amicus[13] Hawaii Employers Council (HEC) urges that there is no need to extend *Parnar* to cover unionized employees. HEC argues that:

> Simply because the remedies in each forum may be different does not mean that an employee has lesser protection under a collective bargaining agreement. Unionized employees have equitable remedies available under their collective bargaining agreements that are not available in actions at law. Reinstatement is a remedy that is commonly awarded by arbitrators under collective bargaining agreements. Moreover, punitive damages are available in arbitration if the parties have not excluded them.
>
> > As the Superior Court of Pennsylvania has held:
> >
> > > [W]e are not persuaded by appellant's arguments that the wrongfully discharged at-will employee has greater

---

[13] Amicus curiae briefs were filed by HEC, Aloha Airlines, Inc., and International Association of Machinists' and Aerospace Workers, AFL–CIO and District Lodge 141 of the International Association of Machinists' and Aerospace Workers, AFL–CIO.

remedies available in a civil action than does a union employee under a collective bargaining agreement since a civil court could award punitive damages.*  While the at-will employee may be entitled to punitive damages in a civil action, he does not have the ability to obtain some of the remedies available to union members; such as reinstatement to his position, which is a commonly provided remedy in labor agreements.  Thus, we find that a difference in remedies is not enough to justify an extension of the coverage of a wrongful discharge action.

> *  Although punitive damages are not generally available under collective bargaining agreements, if the agreement *is silent as to remedies*, arbitrators can award punitive damages.

(Emphasis added.)

HEC's argument is without merit because the CBA in this case is *not* silent as to remedies.  Article XV of the CBA, entitled "Grievance Procedure," paragraph H, provides:

> If as a result of any hearing or appeals therefrom it is found the suspension or discharge was not justified, the employee shall be reinstated without loss of seniority and made whole for any loss of pay he suffered by reason of his suspension or discharge, and his personnel records shall be corrected or cleared of such charge.  If a suspension rather than discharge results, the employee shall have that time he has been held out of service without pay credited against his period of

suspension. In determining the amount of back wages due an employee who is reinstated as a result of the procedures outlined in this Agreement, *the maximum liability of the Company shall be limited to the amount of normal wages he would have earned in the service of the Company had he not been discharged or suspended.*

(Emphasis added.)

The difference between the remedies available under the CBA and the measure of damages under a state tort action are substantial. Where the CBA limits the employer's liability to reinstatement and back wages, the measure of damages under state tort actions includes a sum of money which "will restore [claimant] to the position he [or she] would be [in] if the wrong had not been committed." *Nobriga v. Raybestos–Manhattan, Inc.*, 67 Haw. 157, 162, 683 P.2d 389, 393 (citing *Rodrigues v. State*, 52 Haw. 156, 167, 472 P.2d 509, 517 (1970)), *reconsideration denied*, 67 Haw. 683, 744 P.2d 779 (1984). Where the evidence justifies tort recovery, it may generally include special damages, which compensate claimants for specific out of pocket financial expenses and losses, general damages for pain, suffering, and emotional distress, *In re Hawaii Federal Asbestos Cases*, 734 F. Supp. 1563 (1990), and punitive damages assessed for the purpose of punishing the defendant for aggravated or outrageous misconduct and to deter defendant and others from similar conduct in the future. *See Masaki v. General Motors Corp.*, 71 Haw. 1, 780 P.2d 566, *recon. denied*, 71 Haw. 664, 833 P.2d 899 (1989).

Therefore, we conclude that the wide disparity between the remedies available under the CBA and the damages potentially recoverable in a state tort action, coupled with the legislature's enactment of the HWPA

following *Parnar*, justifies the extension of *Parnar* to this case. We believe such extension promotes the public policies underlying the Federal Aviation Act, the FAR, and the HWPA.

2.

Because we have determined that Norris' state tort claims are not dependent on any interpretation of the CBA, we must now consider "whether application of state law in this case interferes with the scheme of the RLA." *Puchert v. Agsalud*, 67 Haw. at 31, 677 P.2d at 455. We are in accord with the New Jersey Supreme Court in determining that the RLA does not "express [any] congressional limitation of the right of States to protect an employee from discharge in retaliation for reporting violations of law, nor can such limitation be inferred from the federal act's scope." *Maher*, 125 N.J. at 471, 593 A.2d at 758. Moreover, we have held that Norris' claims are not subject to arbitration under the RLA, and thus, we find the defendants' argument that the intent of the RLA, which is to provide a specific arbitral forum for industrial disputes "concerning rates of pay, rules, or working conditions," would be undermined is without merit. Finally, there is nothing in the record to indicate that the intent of the RLA to promote stability of labor–management relations will in any way be disrupted by not preempting Norris' state tort claims. Thus, we conclude that the application of Norris' state–based–tort claims do not interfere with the scheme of the RLA.

## IV. CONCLUSION

Based on the foregoing discussion, we reverse the order of the trial court dismissing counts I and II of Norris'

complaint, vacate the final judgment, and remand this case for further proceedings.

*Edward deLappe Boyle* (*Ernest H. Nomura*, with him on the briefs of Cades, Schutte, Fleming & Wright) for plaintiff–appellant.

*Kenneth Byron Hipp* (*David J. Dezzani* and *Mark E. Recktenwald*, with him on the brief of Goodsill, Anderson, Quinn & Stifel) for defendants–appellees.

On the briefs:

*William W. Watkins* and *David P. Ledger* of Carlsmith, Ball, Wichman, Murray, Case, Mukai & Ichiki, for amicus curiae Hawaii Employers Council.

*Richard M. Rand* of Torkildson, Katz, Jossem, Fonseca, Jaffe & Moore, for amicus curiae Aloha Airlines, Inc.

*Herbert R. Takahashi* of Takahashi & Masui (*Robert A. Bush* of Taylor, Roth, Bush & Geffner of Burbank, California with him on the brief) for amicus curiae International Association of Machinists' and Aerospace Workers.