DAVID C. FARMER, on behalf of the Bankruptcy ESTATE OF DANIEL T. KEOMALU, Plaintiff/Counterclaim Defendant-Appellant,
v.
HICKAM FEDERAL CREDIT UNION; Defendant/Counterclaim Plaintiff/Third-Party Plaintiff-Appellee,
and GERARD AUYONG; and STEPHEN Y.H. KWOCK, Defendants-Appellees,
and JOHN DOES 1-10; JANE DOES 1-10; DOE UNINCORPORATED ASSOCIATIONS, INCLUDING PARTNERSHIPS 1-10, Defendants,
v.
CUTTER PONTIAC, BUICK, GMC OF WAIPAHU, INC., CJW MOTORS, INC., DOES 1-100, Third-Party Defendants.
No. 27868.
Intermediate Court of Appeals of Hawaii.
February 2, 2010.
On the briefs:
R. Steven Geshell, for David C. Farmer, Trustee for Plaintiff/Counterclaim Defendant-Appellant
Jeffrey S. Harris and Heather M. Rickenbrode (Torkildson, Katz, Fonseca, Moore & Hetherington) for Defendant/Counterclaim Plaintiff/Third-Party Plaintiff-Appellee Hickam Federal Credit Union and Defendant-Appellee Gerard Auyong.
Shelton G.W. Jim On and Henry F. Beerman (Jim On & Beerman) for Defendant-Appellee Stephen Y.H. Kwock.

MEMORANDUM OPINION
NAKAMURA, C.J., FOLEY and FUJISE, JJ.
This case arises out of the termination of Daniel T. Keomalu (Keomalu) from his employment with Defendant-Appellee Hickam Federal Credit Union (HFCU). At the time of his termination, Keomalu was Vice-President of Loans.
In 2001, HFCU instituted an automobile dealer loan program which resulted in a higher volume of automobile loans to HFCU members for new and used automobiles. After the dealer loan program began, HFCU experienced a significant increase in the percentage and the amount of delinquent loans made by the loan department, which raised concerns about the soundness of the loans being made. The percentage of delinquent loans increased from 0.39% to 2.22% and the amount of delinquent loans increased from $739,160 to $5,156,846 between September 2001 and August 2002. Based on the concerns regarding its loans, HFCU conducted an investigation involving Keomalu and the loan department.
As part of the investigation, HFCU retained Defendant-Appellee Stephen Y.H. Kwock (Kwock), a certified public accountant (CPA), to review HFCU's loan procedures. Kwock subsequently issued two special audit reports that were critical of Keomalu's performance. The first report stated that as of December 31, 2002, Kwock had identified "53 loans made by Mr. Keomalu that appear to violate the loan policies of [HFCU] or that appear to have been granted to individuals who are not creditworthy." The second report identified an additional 66 loans that had characteristics similar to the loans identified in the first report. Based on Kwock's special audit reports, Defendant-Appellee Gerard Auyong (Auyong), the President of HFCU, submitted two proof-of-loss claims to HFCU's insurer.
Keomalu was subsequently terminated by HFCU on June 27, 2003, after he refused to resign. On April 21, 2004, Keomalu brought a ten-count civil complaint against HFCU, Auyong, and Kwock (collectively, "Defendants") alleging that: (1) Defendants discriminated against Keomalu on the basis of race, age, ancestry, and disability; (2) Defendants retaliated against Keomalu because of his complaints regarding the discrimination; (3) Defendants invaded Keomalu's privacy by placing him in a false light; (4) Defendants negligently inflicted emotional distress on Keomalu; (5) Defendants intentionally inflicted emotional distress on Keomalu; (6) Auyong and Kwock conspired to interfere with Keomalu's employment contract with HFCU; (7) Auyong and Kwock conspired to violate clear mandates of public policy resulting in Keomalu's wrongful discharge; (8) HFCU wrongfully discharged Keomalu in violation of clear mandates of public policy, including policies contained in the Hawaii Whistleblowers' Protection Act (HWPA), Hawaii Revised Statutes (HRS) Chapter 378, Part V; (9) HFCU breached an implied contract regarding Keomalu's employment; and (10) Auyong and Kwock defamed Keomalu.[1]
The Circuit Court of the First Circuit (circuit court)[2] dismissed of all of Keomalu's claims against the Defendants through various pre-trial motions, except for Keomalu's claims of defamation against Auyong and wrongful discharge in violation of public policy contained in the HWPA against HFCU, which claims proceeded to trial. Following the close of Keomalu's case-in-chief, the circuit court granted Auyong's and HFCU's motions for judgment as a matter of law, pursuant to Hawai`i Rules of Civil Procedure (HRCP) Rule 50. Keomalu filed a motion for a new trial. While this motion was pending, the circuit court issued a final judgment, pursuant to HRCP Rule 54(b), in favor of Defendants and against Keomalu on all claims raised by Keomalu in his complaint. Keomalu filed a notice of appeal from this final judgment. The circuit court subsequently denied his motion for new trial.
During the pendency of Keomalu's appeal, Keomalu filed for bankruptcy. David C. Farmer,[3] the trustee for Keomalu's bankruptcy estate, was substituted for Keomalu as the Plaintiff-Appellant. For simplicity, we will attribute the arguments made by Plaintiff-Appellant on appeal to Keomalu.
On appeal, Keomalu argues that the circuit court erred by: (1) dismissing the defamation claim against Kwock on summary judgment; (2) granting Auyong's motion for judgment as a matter of law on the defamation claim against Auyong and excluding the testimony of CPA Everett Harry at trial; (3) dismissing the invasion of privacy/false-light claim against Defendants; (4) dismissing the claims for negligent infliction of emotional distress (NIED) and intentional infliction of emotional distress (IIED) against Kwock; (5) dismissing the claim that Auyong and Kwock conspired to interfere with Keomalu's employment contract with HFCU; (6) dismissing the claim against Auyong and Kwock for conspiracy to violate public policy; (7) dismissing the claim against HFCU for wrongful discharge in violation of public policy (except for the portion of the claim based on the HWPA); (8) granting HFCU's motion for judgment as a matter of law on the claim of wrongful discharge in violation of public policy contained in the HWPA; and (9) denying Keomalu's motion for a new trial. We affirm.

BACKGROUND

I.
During the period relevant to this case, HFCU was a federal credit union that was chartered "for the purpose of promoting thrift among its members and creating a source of credit for provident or productive purposes." HFCU was subject to the general direction and control of a Board of Directors (Board), which consisted of nine members of HFCU who were elected by the members of HFCU. HFCU generated income by lending money to its members, depositing money into other financial institutions in the form of certificates of deposits, and collecting fees.
Keomalu began working at HFCU in 1982 as a collections manager. In 1985, Keomalu became the Vice-President of Loans and was responsible for supervising the loan department as well as the credit and collections department. Auyong was appointed Vice-President of operations in 1985 and became President of HFCU in 1987.
Every twelve to eighteen months, the National Credit Union Administration (NCUA) conducted an examination of HFCU's books and records. In addition to the NCUA's examinations, HFCU retained a CPA to conduct annual audits of its books. For at least ten years, Kwock had been retained by HFCU to conduct the annual audit.
HFCU was insured by CUMIS Insurance Society, Inc. (CUMIS) under CUMIS's Form 500 Credit Union Bond No. XXX-XXXX-X (Bond). Under the Bond, CUMIS agreed to pay HFCU for HFCU's loss of "covered property" resulting directly from a named employee's "failure to faithfully perform his/her trust." The phrase "failure to faithfully perform his/her trust" was defined to mean "acting in conscious disregard of [HFCU's] established and enforced share, deposit, or lending policies." The Bond had a single loss limit of liability of $5,000,000 subject to a $10,000 deductible.

II.
In 2001, HFCU sought to generate more income by working with automobile dealers to refer automobile loans to HFCU. As HFCU formalized their dealer relationships, the volume of automobile loans quickly expanded. HFCU went from 80 automobile loans per month before the dealer loan program to over 300 per month. Keomalu expressed concern over the volume of loans and suggested establishing a dealer loan center, hiring additional staff to handle the dealer loans, and slowing down the dealer loan program. According to Keomalu, Auyong rejected these suggestions.
By November 2001, Auyong started to become concerned about the increasing percentage of loan delinquencies at HFCU. In December 2001, Auyong attended a seminar put on by Rex Johnson (Johnson) of Lending Solutions, Inc., who was an authority on credit union lending. Auyong discussed the increased loan volume at HFCU with Johnson. Upon reviewing about ten of HFCU's loans, Johnson concluded that HFCU was not making "sound" loans.
HFCU loan policy regarding loan security for automobiles, recreational vans, and trucks provided, in relevant part:
a. Used  up to the retail value, as listed in the current Kelley Blue Book.
b. Brand New  up to 100% of invoice.
In a February 2002 memorandum to Keomalu, Auyong reported that he had reviewed 40 loans and identified 26 loans in which the loan amount exceeded the Kelly Blue Book (KBB) value or the Manufacturer's Suggested Retail Price (MSRP), including 13 loans that exceeded the KBB or MSRP by 20% or more. In five instances, a signature loan was made to cover the difference between the KBB value and the price of the vehicle. Auyong also observed problems with loan documentationmany of the loan applications were not signed by the approving loan officer and 9 loans files had no debt ratio worksheetsand found that numerous loans had been made to individuals that lacked or had poor credit scores. Auyong wrote that "[r]ecent circumstances have given rise to the immediate need to evaluate [the dealer loan] program, and perhaps our lending in general, to make appropriate modifications to protect our reserves."
On March 14, 2002, Auyong issued a memorandum notifying Keomalu that Keomalu had been granted a pay raise based on his performance evaluation for the period September 2000 through September 2001. Keomalu's performance for that period had been evaluated by his then supervisor, Cindy Geiling.
Auyong decided to take charge of the dealer loan program in April 2002. He explained his decision and concerns regarding the program in a May 2002 memorandum to Keomalu and others. Among the concerns expressed by Auyong were that "61% of the loan applications processed reflected persons with credit reports less than the parameter that [HFCU] had established"[4] and that loans had been made for vehicles that were overpriced, to the apparent detriment of the member/borrower and HFCU, which shared in the risk. Under the management change, Keomalu did not have day-to-day responsibility for the dealer loan program, but worked with Auyong as a policy setter, liaison with dealer management, and overseer of the program.
At the end of July 2002, Keomalu looked at some of the collection efforts on delinquent loans and noted that many delinquent loans had no collection history. Keomalu directed the collection manager, Lynne Elsman, to follow up on the delinquent loans. Elsman prepared a list of delinquent loans and recommended that certain loans be charged off the books and assigned to a collection agency. Keomalu disagreed and contended that delinquent loans should not be charged off before the refund from the cancellation of insurance was collected and the automobile was sold, because charging off loans before these steps were taken would inflate HFCU's losses. Auyong agreed with Elsman's recommendation to charge off the loans.

III.
Delinquencies increased from 0.39% of loans totaling $739,160 in September 2001 to 2.22% of loans totaling $5,156,846 in August 2002. In an October 2002 memorandum, Auyong wrote to Keomalu that the HFCU Board was concerned over the significant increase in loan delinquencies and that "there is evidence that weakness in both the underwriting of and collection of loans made have contributed to the adverse financial condition of [HFCU]." By letter to Auyong dated October 14, 2002, Johnson of Lending Solutions, Inc. summarized his findings after reviewing examples of loans made by HFCU. Johnson found numerous examples of nonperforming loans that "were way beyond what the most aggressive credit union would ever have approved." Johnson stated that "there were warning signs and red flags everywhere that were ignored[;]" automobile loans "were granted well in excess of the members['] annual income making it virtually impossible for the member to pay"; certain loans referred by the dealer were of extremely poor quality; HFCU loan practices were well beyond even the most aggressive credit unions; and he believed HFCU's decision making would result in significant losses over the next two or three years.
In response to the increasing loan delinquencies and Johnson's negative review of HFCU's loan practices, the HFCU Board decided to conduct a formal review of HFCU's lending activities. To facilitate the review, Keomalu was placed on administrative leave in October 2002. HFCU formed an Ad Hoc Committee to oversee the review of its lending practices. In an October 24, 2002, report to the Ad Hoc Committee, Auyong noted that a review of HFCU's lending activities revealed, among other things, missing loan documentation; loans made to members with poor credit scores; loan files containing a second unsecured loan in addition to the auto loan, which served to "circumvent Board policy addressing loan-to-value conditions"; and poor management, communication, and morale within the loan department.
On November 4, 2002, Sharon Sakamoto, Vice-President of finance at HFCU, called Kwock and asked him to review certain loans made by HFCU. Based on Kwock's preliminary review of the loans, Auyong signed and submitted to CUMIS a Notice of Loss Bond on November 8, 2002, notifying CUMIS of potential losses attributable to Keomalu. The notice estimated the loss from 30 loans HFCU reviewed as between $90,000 and $150,000 and stated that there may be further losses not yet identified. The notice included a statement on how the losses were caused, which provided in relevant part:
The Credit Union's loan policies allow for auto loans to be approved at an amount not to exceed 100% of the current Kelley Blue Book. The selling price (invoice) of the used autos was in excess of the KBBV [(Kelley Blue Book Value)] and as such, the loan officer(s) had issued two separate loans. This scheme allowed one loan to be approved at an amount equal to the KBBV and the second loan was approved to pay for the difference between the KBBV and the invoice price. In all of our sampled cases, we noted that the two loans check [sic] were made payable to the dealers. The effective result was that the two loans combined had exceeded the KBBV, which is contrary to the Credit Union's loan policy.
. . . .
We identified additional schemes from scanning the recent charged off auto loan files. One scheme involved loans made to non-creditworthy individuals who had credit scores below 500. An explanation for approving a loan to such individuals was not documented as required by the credit union's policy. Another scheme involved auto loans exceeding the fair market value of the collateralized auto.. . . . Basically, it appears that auto loans were made to individuals who were not creditworthy or that the auto loans exceeded the collateral value. These additional schemes need further investigation and corroborative evidence to determine whether such activities are violation of the credit union's policies and procedures and whether the credit union realized a loss from such irregular activities.

IV.
On December 12, 2002, Kwock and HFCU entered into an agreement identifying the procedures Kwock would use and the scope of services he would provide in conducting a special audit of HFCU's loan activities. Kwock agreed to perform agreed upon procedures "for the purpose of determining whether [HFCU] realized a loss as a result of irregular activities performed by [Keomalu] . . . ." Kwock further agreed to "immediately apprise [HFCU] when we locate evidence of [Keomalu's] disregard of [HFCU's] loan policies, which resulted in loss to your credit union" and to "assist in sending a proof of loss claim to [CUMIS] identifying the loss, if any . . . ."
On December 31, 2002, Kwock issued a special audit report. In preparing the report, Kwock and his audit team reviewed loans identified by HFCU staff; interviewed Keomalu and other HFCU employees to determine their understanding of HFCU's loan policies; read HFCU's loan policies and procedures; and obtained a list of auto loans with duplicate vehicle numbers indicating two outstanding loans securing the same vehicle. The report stated that
[Keomalu] violated key loan polices that were established by [HFCU] to prevent poor loans. As of December 31, 2002, we noted 53 loans made by Keomalu that appear to violate the loan polices of [HFCU] or that appear to be granted to individuals who are not creditworthy.
Kwock's report described two "schemes" that were used with respect to the "irregular" loans made by Keomalu. The first "scheme" involved "combo loans" in which an automobile loan was combined with a signature loan to pay for a used automobile that cost more than the retail KBBV. The report found that the combo loans "appeared to violate" HFCU's policy of limiting loans for used automobiles to the retail KBBV because the combined total of the two loans exceeded the KBBV. The report reasoned that the purpose of HFCU's policy was to avoid committing HFCU to "unacceptable risk."
The report noted that Kwock had initially found 15 combo loans that not only were granted outside HFCU's policies but were made to people with poor credit scores. The report referenced Keomalu's position that as long as the member could qualify for both the used automobile loan and the signature loan, the combo loan would not violate HFCU's policies. According to Keomalu's explanation, the used automobile loan could be made up to the KBBV and the signature loan could be made to cover dealer additions such as Guaranteed Auto Protection (GAP) insurance premiums, extended warranties, and upgrades in accessories. The report noted, however, that the combo loans were not made in a manner consistent with Keomalu's explanation. Kwock found numerous combo loans in which the auto loan amount exceeded the KBBV and the signature loan amount exceeded the cost of the dealers' additions.
The second "scheme" involved Keomalu's granting used automobile loans to members purchasing automobiles that HFCU had repossessed from other members. The loans to purchase the repossessed automobiles consistently exceeded the KBBV and were often made to members with low credit ratings. Instead of using the proceeds from the used automobile loan to pay off the defaulted loan for the repossessed automobile, the proceeds were given to the dealer who sold the automobile. The report found that HFCU did not have a formal consignment agreement with the dealer regarding the sale of the repossessed automobile. The amount paid by the dealer to HFCU for the repossessed automobile was consistently less than the proceeds of the used automobile loan. In addition, there was a significant time lag between the making of the used automobile loan and the dealer's payment which was used to pay off the first automobile loan. This time lag resulted in HFCU having two outstanding loans to different members secured by the same automobile.
The report identified 53 "irregular" loans made by Keomalu pursuant to the two "schemes" that represented a total of $529,630.26 in outstanding loans. Kwock's report recommended that HFCU submit a proof-of-loss claim to CUMIS in the amount of $529,630.26 as "provable loan losses" for these 53 loans. The report, however, recognized that only 5 of the 53 loans had been charged off, 3 were in repossession, 13 were delinquent, and the remaining 32 were not past due as of the date of the report.
On January 9, 2003, Auyong submitted a proof-of-loss claim to CUMIS in the amount of $529,630.26 based on Keomalu's "lack of faithful performance." Attached to the proof-of-loss claim was Kwock's December 31, 2002 special audit report. On
January 24, 2003, CUMIS advised HFCU that the proof-of-loss claim was deficient because it sought compensation for loans that were not yet charged off and thus were not actual losses.
Kwock issued a second special audit report on February 11, 2003, which listed HFCU loans that resulted in actual, rather than potential, losses. Kwock identified 66 additional loans that had characteristics similar to the two schemes previously reported, which included 45 loans that had been charged off for a total actual loss of $247,480.94. The 45 charged-off loans consisted of 24 under the combo loan scheme, 5 in which a single used automobile loan was granted above the retail KBBV, and 16 under the scheme involving duplicate loans for repossessed automobiles. When combined with the 5 charged-off loans identified in the first report, the total actual loss for the charged-off loans related to the two schemes was $291,973.39. The second report concluded that "[i]t appears that [HFCU] incurred a loss because the loans were made outside of policy and the loans were granted at above the fair market value of the collateral." The second report anticipated that there may be additional losses because there were still loans that fit into the two schemes that had not been charged off. The second report recommended that HFCU submit the report to CUMIS as an amended proof-of-loss claim.
Based on Kwock's second report, HFCU submitted an amended proof-of-loss claim to CUMIS on March 3, 2004, for $291,973.39. By letter dated September 4, 2003, CUMIS denied HFCU's amended claim on the grounds that (1) HFCU had not demonstrated that "Keomalu failed to faithfully perform his trust" and (2) HFCU did not timely file its claim following the discovery of the alleged loss.

V.
On January 29, 2003, HFCU's Board dissolved the Ad Hoc Committee, and the Board assigned the responsibility for reviewing HFCU's lending practices to the Supervisory Committee and the responsibility for reviewing the human resources issues to the Personnel Committee. Neither Auyong nor Kwock was a member of the Personnel Committee. On June 6, 2003, the Personnel Committee submitted its report to the Board. The report concluded that:
a. [Keomalu] did not perform in his capacity as Vice President, Loans to provide effective leadership for the Loan and Credit Departments as well as the employees under his area of responsibility;
b. [Keomalu] did not perform in his capacity as a lending officer, as delegated by the Board of Directors, to exercise prudent judgment in the underwriting and processing of loans; and
c. [Keomalu] did not provide for member service, by "expediting" the purchase of "overpriced" vehicles to members; i.e. "encouraging" members to buy a car (financed by HFCU) when it was a "bad" deal for the member.
The Personnel Committee recommended that Keomalu be given the opportunity to resign and, if he was unwilling to resign, that he be fired.
On June 19, 2003, the Board gave Keomalu the choice of either resigning or being fired. Upon refusing to resign, Keomalu's employment was terminated effective June 27, 2003.

STANDARDS OF REVIEW

A. Motion to Dismiss
A circuit court's ruling on a motion to dismiss is reviewed de novo. Wright v. Home Depot U.S.A., Inc., 111 Hawai`i 401, 406-07, 142 P.3d 265, 270-71 (2006).
A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. This court] must therefore view a plaintiff's complaint in a light most favorable to him or her in order to determine whether the allegations contained therein could warrant relief under any alternative theory. For this reason, in reviewing [a] circuit court's order dismissing [a] complaint . . . [this court's] consideration is strictly limited to the allegations of the complaint, and [this court] must deem those allegations to be true.
In re Estate of Rogers, 103 Hawai`i 275, 280-81, 81 P.3d 1190, 1195-96 (2003) (citations omitted) (some brackets and ellipsis in original) (some brackets added).
County of Kaua`i v. Baptiste, 115 Hawai`i 15, 24, 165 P.3d 916, 925 (2007).

B. Summary Judgment
"We review the circuit court's grant or denial of summary judgment de novo," Querubin v. Thronas, 107 Hawai`i 48, 56, 109 P.3d 689, 697 (2005), using the same standard applicable to the circuit court. Iddings v. Mee-Lee, 82 Hawai`i 1, 5, 919 P.2d 263, 267 (1996). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Hawai`i Rules of Civil Procedure (HRCP) Rule 56(c).
Once the moving party has satisfied its initial burden of showing the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law, the opposing party "may not rest upon the mere allegations or denials of [the opposing party's] pleading" but must come forward, through affidavit or other evidence, with "specific facts showing that there is a genuine issue for trial." HRCP Rule 56(e). If the opposing party fails to respond in this fashion, the moving party is entitled to summary judgment as a matter of law. Hall v. State, 7 Haw. App. 274, 284, 756 P.2d 1048, 1055 (1988); see also HRCP 56(e).
Wittig v. Allianz, A.G., 112 Hawai`i 195, 200, 145 P.3d 738, 743 (App. 2006).
A summary judgment motion challenges the very existence or legal sufficiency of the claim or defense to which it is addressed. In effect the moving party takes the position that he is entitled to prevail because his opponent has no valid claim for relief or defense to the action, as the case may be. He thus has the burden of demonstrating that there is no genuine issue as to any material fact relative to the claim or defense and he is entitled to judgment as a matter of law.
First Hawaiian Bank v. Weeks, 70 Haw. 392, 396, 772 P.2d 1187, 1190 (1989) (quotation marks, ellipsis points, and citations omitted).
Where the party defending the action (who does not have the burden of proof) moves for summary judgment,
[h]e may discharge his burden by demonstrating that if the case went to trial there would be no competent evidence to support a judgment for his opponent. For if no evidence could be mustered to sustain the nonmoving party's position, a trial would be useless.
Id. at 396-97, 772 P.2d at 1190. (quotation marks, ellipsis points, brackets, and citations omitted).
In construing Federal Rules of Civil Procedure (FRCP) Rule 56(c), on which Hawai`i Rules of Civil Procedure (HRCP) Rule 56(c) is modeled, the United States Supreme Court has stated:
In our view, the plain language of [FRCP] Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quotation marks omitted).
"A party opposing a motion for summary judgment cannot discharge his or her burden by alleging conclusions, `nor is [that party] entitled to a trial on the basis of a hope that [he or she] can produce some evidence at that time.'" Henderson v. Prof'l Coatings Corp., 72 Haw. 387, 401, 819 P.2d 84, 92 (1991) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2727 (1983)).
Wilson v. Freitas, 121 Hawai`i 120, 127, 214 P.3d 1110, 1117 (App. 2009) (brackets in original).

C. Judgment as a Matter of Law (HRCP Rule 50)
[I]t is well settled that a trial court's rulings on motions for judgment as a matter of law are reviewed de novo. When reviewing a motion for judgment as a matter of law, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and the motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.
Kramer v. Ellett, 108 Hawai`i 426, 430, 121 P.3d 406, 410 (2005) (internal quotation marks, citations, and brackets omitted).

DISCUSSION

I.
Keomalu argues that the circuit court erred in determining that there was no genuine issue of material fact that Kwock was protected by a qualified privilege and in granting Kwock's motion for summary judgment on Keomalu's defamation claim. We disagree. We conclude that Kwock was protected by a qualified privilege and was entitled to summary judgment on Keomalu's defamation claim.
A plaintiff must establish the following four elements to sustain a claim for defamation:
a) a false and defamatory statement concerning another;
b) an unprivileged publication to a third party;
c) fault amounting at least to negligence on the part of the publisher [actual malice where the plaintiff is a public figure]; and
d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.
Gold v. Harrison, 88 Hawai`i 94, 100, 962 P.2d 353, 359 (1998) (brackets in original) (quoting Dunlea v. Dappen, 83 Hawai`i 28, 36, 924 P.2d 196, 204 (1996)). Thus, among the elements of proof that the plaintiff must establish is that the defendant made "an unprivileged publication to a third party." Id.
Even if a statement is defamatory, the author of the statement is protected by a qualified privilege when he or she "reasonably acts in the discharge of some public or private duty, legal, moral, or social, and where the publication concerns subject matter in which the author has an interest and the recipients of the publication a corresponding interest or duty." Russell v. American Guild of Variety Artists, 53 Haw. 456, 460, 497 P.2d 40, 44 (1972). Whether a particular communication is privileged is "an issue of law to be determined by the court." Kainz v. Lussier, 4 Haw. App. 400, 405, 667 P.2d 797, 802 (1983).
A qualified privilege can be lost if the defendant abused the privilege by acting with malice. Towse v. State, 64 (1982); see Russell, 53 & n.4, 46. The Hawai`i Supreme Court has adopted a reasonable person test for determining malice. Towse, 64 Haw. at 632-33, 647 P.2d at 702-03; Russell, at 463 n.4, 497 P.2d at 45 n.4.
Thus, in the instance where malice is alleged to extinguish a qualified privilege, defendant is required to act as a reasonable man under the circumstances, with due regard to the strength of his belief, the grounds that he has to support it, and the importance of conveying the information.
Towse, 64 Haw. at 632-33, 647 P.2d at 703 (internal quotation marks and citation omitted).
On appeal, Keomalu does not dispute that Kwock was entitled to the protection of a qualified privilege in preparing and submitting the two special audit reports to HFCU. Instead, Keomalu argues that Kwock acted with malice and therefore lost any qualified privilege. Keomalu contends that there are material issues of fact regarding whether Kwock acted with malice which preclude the grant of summary judgment. We disagree and conclude that there is no genuine issue as to any material fact that Kwock did not act with malice.
In preparing the reports, Kwock and his team (1) conducted an extensive review of loans made by HFCU, including loans identified by HFCU staff that related to loans granted to members who had poor credit or were supported by inadequate documentation; (2) interviewed Keomalu and other HFCU employees to determine their understanding of HFCU's loan policies; (3) read HFCU's loan policies and procedures; and (4) obtained a listing of automobile loans with duplicate vehicle identification numbers. Kwock's special audit reports include the basis for Kwock's conclusion that Keomalu appeared to have violated HFCU's loan policy and Kwock's method for calculating the amount of loss Kwock recommended that HFCU include in its claims to CUMIS. Keomalu does not contend that Kwock failed to perform the interviews and research Kwock claimed.
Keomalu asserts that he did not violate HFCU's loan policies and that Kwock's contrary conclusion created a material issue of fact regarding malice. We disagree. Whether Keomalu's loan practices violated HFCU's policy of limiting used automobile loans to the retail KBBV was a matter of interpretation. Auyong agreed with Kwock that Keomalu's loan practices violated and circumvented the intent of that policy, which was designed to protect HFCU against loaning more than the value of the automobile. Other HFCU loan officers also expressed concern about the validity and soundness of Keomalu's loan practices.
The dispute over how to interpret HFCU's loan policy did not create a material issue of fact regarding malice. Even if Kwock's interpretation of HFCU's loan policies was subject to challenge or could be proven to be wrong, this would not demonstrate that Kwock acted with malice. The record established that Kwock had reasonable grounds to support the conclusions he reached in the audit reports. There was no genuine issue of fact that Kwock acted as a reasonable person under the circumstances with due regard to the strength of his belief, the grounds he had to support it, and the importance of conveying the information.
We also reject Keomalu's claim that the report of his accounting expert, Everett Harry (Harry), which contain an analysis of Kwock's special audit reports, created a material issue of fact regarding malice. In his report, Harry, among other things, (1) contends that Kwock incorrectly characterized Kwock's reports as "special audit" reports, (2) opines that Kwock failed to comply with professional standards regarding the required elements for a special audit report or an agreed-upon procedures report, and (3) disagrees with Kwock's conclusions. However, in his agreement with HFCU, Kwock described the limitations in the scope of services he would provide in conducting the special audit, including that the procedures he agreed to perform "will not constitute an audit made in accordance with generally accepted auditing standards." Kwock also detailed the investigation he undertook in preparing his reports and explained the basis for his opinions. We conclude that Harry's report does not serve to create a genuine issue of material fact regarding whether Kwock acted without malice.

II.
For similar reasons, we conclude that the circuit court did not err in granting judgment as a matter of law, pursuant to HRCP Rule 50, on Keomalu's claim that Auyong defamed Keomalu by submitting the proof-of-loss claims to CUMIS. Auyong was also protected by a qualified privilege because as President of HFCU, he had a duty to take action and attempt to recover losses sustained by the HFCU due to "bad" loans made by Keomalu and those under Keomalu's supervision. Auyong filed the proof-of-loss claims with CUMIS based on Kwock's reports and the authorization of the HFCU Board. Keomalu's theory that Auyong falsely blamed Keomalu for the bad loans to protect Auyong's own job was not supported by sufficient evidence to raise a viable claim of malice on Auyong's part.
The circuit court's exclusion of Harry's testimony at trial does not provide Keomalu with any basis for relief. Harry conducted his evaluation of Kwock's special audit reports long after Auyong submitted the proof-of-loss claims to CUMIS. Harry's testimony would not have served to show that Auyong should have doubted the validity of the conclusions reached by Kwock in Kwock's special audit reports. Thus, Harry's testimony could not have served to overcome Auyong's qualified privilege.

III.
The same qualified privilege that bars Keomalu's defamation claim against Kwock and Auyong also bars Keomalu's claim against Defendants for invasion of privacy for placing him in a false light (false-light claim) and Keomalu's claims against Kwock for NIED and IIED. The policy concerns that justify the recognition of a qualified privilege in defamation cases also support the recognition of a qualified privilege in false-light, NIED, and IIED cases that are based on allegedly false and disparaging communications. See Russell, 53 Haw. at 459-61, 497 P.2d at 43-44; Hines v. Arkansas Louisiana Gas Co., 613 So. 2d 646, 658 (La. Ct. App. 1993); Wallin v. Minnesota Dep't of Corrections, 598 N.W.2d 393, 406 (Minn. Ct. App. (1999).
Courts have held that where a false-light claim is based on the same statements as a defamation claim, the false-light claim must be dismissed if the defamation claim is dismissed. Gold, 88 Hawai`i at 103, 962 P.2d at 362; McClatchy Newspapers, Inc. v. Superior Court, 234 Cal. Rptr. 702, 704 (Cal. Ct. App. 1987). The same is true of emotional distress claims that are derived from or are "parasitic" of a defamation claim. Basilius v. Honolulu Publishing Co., 711 F. Supp. 548, 552 (D. Haw. 1989); see Gold, 88 Haw. at 103, 962 P.2d at 362; Wallin, 598 N.W.2d at 406.
Here, Keomalu's false-light, NIED, and IIED claims are based on essentially the same factual foundation as his defamation claim. Thus, our conclusion that the circuit court properly resolved Keomalu's defamation claim means that it also properly resolved Keomalu's false-light, NIED, and IIED claims.
Moreover, there are additional grounds supporting the circuit court's dismissal of Keomalu's false-light, NIED, and IIED claims, which we discuss below.

A. False-light claim
The circuit court properly dismissed Keomalu's false-light claim because Keomalu failed to allege a sufficient degree of publicity. The false-light tort is defined in the Restatement (Second) of Torts (Restatement) § 652E as follows:
One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.
Restatement § 652E (1997) (cited in Chung v. McCabe Hamilton & Renny Co., 109 Hawai`i 520, 534 n.18, 128 P.3d 833, 847 n.18 (2006)).
Comment a to Restatement § 652E refers to and applies the definition of "publicity" found in Comment a to Restatement § 652D. Comment a to Restatement § 652D explains that, "`[p]ublicity,' . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement § 652D comment a. Therefore,
it is not an invasion of the right of privacy . . . to communicate a fact . . . to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication.
Id.
Keomalu's complaint did not allege a sufficient degree of publicity to sustain his false-light claim. In paragraph 16 of his complaint, Keomalu alleges that Defendants "[d]iscredit[ed] [Keomalu] in the eyes of the [HFCU] employees with false and defamatory accusations of incompetence" and "creat[ed] a false impression in the eyes of employees that [Keomalu] was incompetent and making bad loans and collections decisions . . . ." The limited degree of publicity alleged is confined to HFCU employees, and there is no allegation that information which purportedly placed Keomalu in a false light was communicated to so many people that it was substantially certain to become public knowledge.[5] See Pace v. Bristol Hosp., 964 F. Supp. 628, 630-32 (D. Conn. 1997). Therefore, the circuit court properly dismissed Keomalu's false-light claim because Keomalu's complaint failed to allege a sufficient degree of publicity to support that claim.

B. NIED Claim
The circuit court properly dismissed Keomalu's NIED claim against Kwock on the ground that Kwock owed no legal duty to Keomalu. A claim for NIED "is nothing more than a negligence claim in which the alleged actual injury is wholly psychic and is analyzed utilizing ordinary negligence principles." Doe Parents No. 1 v. State, Dep't of Educ., 100 Hawai`i 34, 69, 58 P.3d 545, 580 (2002)(internal quotation marks and citation omitted). "[A] prerequisite to any negligence action is the existence of a duty owed by the defendant to the plaintiff[] that requires the defendant to conform to a certain standard of conduct for the protection of the plaintiff against unreasonable risks. Id. at 71, 58 P.3d at 582 (quotation marks, brackets, and citations omitted).
With respect to a negligence claim, "a duty is owed when, considering the policies favoring recovery against those limiting liability, the sum total of those policies leads the law to say that a particular plaintiff is entitled to protection." Blair v. Ing, 95 Hawai`i 247, 270, 21 P.3d 452, 475 (2001). And "a new duty will not be imposed upon members of society without a logical, sound, and compelling reason." Id. In determining whether an accountant owes a legal duty of care to a non-client, courts must consider:
(1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the policy of preventing future harm; and (6) whether imposing liability imposed an undue burden upon the profession.
Id.
In Blair, the plaintiffs were the co-trustees and beneficiaries of a trust created by their parents. Id. at 250-51, 21 P.3d at 455-56. Plaintiffs sued an accountant who had been hired by plaintiffs' mother to prepare the estate tax returns for plaintiffs' father. Id. at 251, 21 P.3d at 456. Plaintiffs alleged that the accountant was negligent because he failed to utilize tax saving techniques that would have reduced the estate taxes owed by plaintiffs' parents' estate. Id. Based on its review of the record, the Hawai`i Supreme Court concluded that there was no genuine issue of material fact that plaintiffs' mother had retained the services of the accountant for the preparation of estate tax returns, and not for estate tax advice. Id. at 267-70, 21 P.3d at 472-75. The court therefore determined that plaintiffs were not intended beneficiaries of the agreement and relationship between the accountant and plaintiffs' mother. Id. at 268, 270, 21 P.3d at 473, 475. The court declined to impose a legal duty on the accountant to plaintiffs under these circumstances. Id. Based on the absence of a legal duty owed by the accountant to plaintiffs, the court held that, as a matter of law, the accountant was entitled to summary judgment in his favor on plaintiffs' negligence claim. Id.
Similarly, Kwock did not owe a legal duty of care to Keomalu. Keomalu was not a party to the agreement between Kwock and HFCU. Kwock was hired by HFCU to conduct a special audit of HFCU's and Keomalu's loan activities for the benefit of HFCU, and Keomalu was not an intended beneficiary of the Kwock-HFCU contract. Furthermore, imposing on Kwock a legal duty to Keomalu under the circumstances of this case would likely create an undue burden on the accounting profession. Kwock's special audit reports were intended to be an external review conducted by Kwock to assist HFCU in identifying problems in its lending practices and procedures. If accountants were exposed to potential liability for claims brought by anyone who may be negatively impacted by such a review, it would have a chilling effect on the willingness of accountants to undertake special audits and to be candid in performing them.
We conclude that Kwock did not owe a legal duty to Keomalu. See id; Semida v. Rice, 863 F.2d 1156, 1160 (4th Cir. 1988). The circuit court was therefore correct in dismissing Keomalu's NIED claim against Kwock.

C. IIED Claim
Keomalu's claim of IIED against Kwock was based on Kwock's special audit reports. The elements of proof for an IIED claim are: "1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another." Hac v. University of Hawaii, 102 Hawai`i 92, 106-07, 73 P.3d 46, 60-61 (2003). As a matter of law, Keomalu could not prove that Kwock's conduct was outrageous. See Shoppe v. Gucci America Inc., 94 Haw. 368, 387, 14 P.3d 1049, 1068 (2000). The circuit court properly granted Kwock's motion to dismiss and/or for partial summary judgment on Keomalu's IIED claim against Kwock.

IV.
Keomalu argues that the circuit court erred by dismissing his claim against Kwock and Auyong for conspiring to interfere with his employment contract with HFCU.
The requisite elements of tortious interference with contractual relations are: 1) a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract; 3) the defendant's intentional inducement of the third party to breach the contract; 4) the absence of justification on the defendant's part; 5) the subsequent breach of the contract by the third party; and 6) damages to the plaintiff . . . .
Meridian Mortgage, Inc. v. First Hawaiian Bank, 109 Hawai`i 35, 44, 122 P.3d 1133, 1142 (App. 2005) (brackets and emphasis omitted) (quoting Weinberg v. Mauch, 78 Hawai`i 40, 50, 890 P.2d 277, 287 (1995)).
An employee or officer of a company, acting within the scope of his or her employment, cannot be liable for interfering with a contract of his or her employer. See Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, 113 Hawai'i 251, 273-75, 151 P.3d 732, 754-56 (2007). In Kahala Royal, the plaintiff brought suit against two corporate officers and directors, who were acting within the scope of their authority, for tortiously interfering with the contractual relations of the entities they represented. Id. at 273, 151 P.3d at 754. The Hawai`i Supreme Court upheld the dismissal of the plaintiff's complaint, reasoning that
A party cannot "interfere" with its own contracts, so the tort [of tortious interference with the corporation's contracts] itself can be committed only by a third party. In the case of a corporation, the legal entity acts through its directors and officers. Thus, when officers or directors act in their official capacity as agents of the corporation, they act not as individuals but as the corporation itself. In doing so, they are not acting as a third party, but rather as a party to the contract and cannot be personally liable for tortious interference with the contract.
Id. at 274, 151 P.3d at 755 (quoting Trail v. Boys & Girls Club of Northwest Indiana, 845 N.E.2d 130, 138 (Ind. 2006)).
Keomalu's complaint alleges that Auyong was "at all times . . . acting . . . within the scope of his employment as an employee of [HFCU]." Because Auyong was acting within the scope of his employment for HFCU at all relevant times, he was not a third party to the employment contract between Keomalu and HFCU, and he could not tortiously interfere with the employment contract. Therefore, the circuit court properly dismissed Keomalu's claim against Auyong for conspiracy to interfere with the contract between Keomalu and HFCU.
Given the proper denial of Keomalu's claim against Auyong, Keomalu's claim against Kwock for conspiracy to interfere with Keomalu's employment contract with HFCU likewise cannot stand and was properly dismissed.
Generally speaking, the accepted definition of a conspiracy is a combination of two or more persons or entities by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means.
Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawai`i 224, 252 n.28, 982 P.2d 853, 881 n.28 (1999) (internal quotation marks, brackets, and citations omitted). Kwock could not form a conspiracy with Auyong to interfere with Keomalu's employment contract with HFCU because Auyong was acting within the scope of his employment at all times, and Auyong was not a third party to the contract. Without a combination of two persons, no conspiracy can occur, and thus Kwock could not have conspired with Auyong to tortiously interfere with Keomalu's employment contract with HFCU.[6] The circuit court properly granted Kwock's motion to dismiss and/or for partial summary judgment on Keomalu's claim against Kwock for conspiracy to interfere with Keomalu's employment contract.

V.
Keomalu argues that the circuit court erred by dismissing Keomalu's claim that Kwock and Auyong conspired to violate public policy resulting in Keomalu's wrongful discharge from HFCU. This claim was made pursuant to Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625, 631 (1982), which held that "an employer may be held liable in tort where his discharge of an employee violates a clear mandate of public policy." We conclude that the circuit court properly dismissed Keomalu's claim that Kwock and Auyong conspired to violate public policy resulting in Keomalu's wrongful discharge.
At the outset, we note that Keomalu was not terminated by Kwock or Auyong, but by the HFCU Board based on the recommendation of the Personnel Committee, of which neither Kwock nor Auyong was a member. Kwock was not Keomalu's supervisor or even an employee of HFCU. Under these circumstances, it is difficult to see how Kwock and Auyong could have conspired to wrongfully discharge Keomalu in violation of public policy.
Putting that aside, Keomalu asserted that Kwock and Auyong conspired to violate the clear mandates of public policy against discrimination on the basis of race, age, ancestry, and disability set forth in HRS § 378-2(1), (2), (3), and (6) (Supp. 2008). A Parnar tort based on a violation of public policy is limited, however, to situations in which "a remedy is not provided for violation of the clear public policy involved." Takaki v. Allied Machinery Corp., 87 Hawai`i 57, 63, 951 P.2d 507, 513 (App. 1998) (internal quotation marks omitted). Stated another way, where "the statutory or regulatory provisions which evidence the public policy themselves provide a remedy for the wrongful discharge, provision of a further remedy under the public policy exception is unnecessary." Ross v. Stouffer Hotel Co., 76 Hawai`i 454, 464, 879 P.2d 1037, 1047 (1994) (internal quotation marks and citations omitted).
Here, HRS Chapter 378, Part I, which prohibits the discriminatory employment practices set forth in HRS § 378-2, also provides a remedy for victims of these discriminatory employment practices. See HRS § 378-5 (1993). Thus, Keomalu was not entitled to bring a claim for conspiracy to violate public policy based on alleged violations of HRS § 378-2. See Ross, 76 Hawai`i at 463-64, 879 P.2d at 1046-47; Takaki, 87 Hawai`i at 63, 951 P.2d at 513.
For a civil conspiracy claim to be valid, an underlying tort must be shown. We have already rejected Keomalu's challenge on appeal to the circuit court's dismissal of Keomalu's claims for defamation, false-light, NIED, and IIED. To the extent that Keomalu's claim for conspiracy to violate public policy resulting in his wrongful discharge was based on these alleged underlying torts, the circuit court's dismissal of the public policy conspiracy claim was likewise proper.

VI.
Prior to trial, the circuit court dismissed Keomalu's claim that HFCU violated public policy resulting in Keomalu's wrongful discharge, except for the portion of his claim alleging that HFCU had violated public policies contained in the HWPA which the court allowed to proceed to trial. Keomalu argues that the circuit court erred in dismissing his non-HWPA public policy claim. We disagree.
We reject Keomalu's argument that he was entitled to bring a public policy claim based on the allegation that his termination violated disciplinary procedures set forth in HFCU's Employee Handbook. There is no constitutional, statutory, or regulatory provision requiring compliance with HFCU's Employee Handbook. See Parnar, 65 Haw. at 380, 652 P.2d at 631. Contrary to Keomalu's argument, Kinoshita v. Canadian Pacific Airlines, Ltd., 68 Haw. 594, 724 P.2d 110 (1986), does not establish a clear mandate of public policy prohibiting the violation of an employee manual. Indeed, the Hawai`i Supreme Court has held that "Hawai`i law does not recognize tortious breach of contract actions in the employment context." Francis v. Lee Enterprises, Inc., 89 Hawai'i 234, 235, 244, 971 P.2d 707, 708, 717 (1999). Other jurisdictions have concluded that internal company policies or private standards do not establish a clear mandate of public policy upon which to base a Parnar-type wrongful-discharge claim. See Turner v. Anheuser-Bush, Inc., 876 P.2d 1022, 1033 (Cal. 1994); Jaynes v. Centura Health Corp., 148 P.3d 241, 244-45 (Colo. Ct. App. 2006).
We also reject Keomalu's claim that his discharge by HFCU violated public policy because it was done in contravention of his rights to free speech and due process under the federal constitution. The constitutional provisions that protect these rights do not apply to actions by a federal credit union because it is not a state actor. See Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1132 (9th Cir. 1994); Anderson v. Wiggins, 460 F. Supp. 2d 1, 7 (D.C. Cir. 2006). Thus, Keomalu failed to allege any cognizable constitutional violation upon which to bring a public policy claim.

VII.
Keomalu argues that the circuit court erred in granting HFCU's motion for judgment as a matter of law, pursuant to HRCP Rule 50, on his claim of wrongful discharge in violation of public policies contained in the HWPA. The HWPA states, in relevant part, that:
An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
(1) The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:
(A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States[.]
HRS § 378-62 (Supp. 2009).
Keomalu argues that: (1) he was reporting violations or suspected violations of state and federal laws when he told Auyong to slow down the dealer loan program and when he objected to the charging off of delinquent loans; and (2) because he was discharged as a result of expressing concerns to Auyong about the pace of the dealer loan program and objecting to HFCU's practice in charging off loans, his discharge violated public policies contained in the HWPA. We disagree with Keomalu's arguments and conclude that the circuit court properly granted HFCU's motion for judgment as a matter of law.
Keomalu asserts that he told Auyong that the people responsible for loans at HFCU were overwhelmed by the volume of loan applications from the dealer loan program and he repeatedly requested that HFCU slow down the dealer loan program. Evidence that Keomalu told Auyong to slow down the dealer loan program does not, however, amount to a report of a violation or suspected violation of the law. Keomalu does not cite to any law that prohibits HFCU from investing its resources in automobile loans obtained through automobile dealers or that limits the volume of loans that a credit union can take in as part of a dealer loan program.
We reject Keomalu's contention that his complaints to Auyong about the dealer loan program constituted a report of a violation or suspected violation of the law because his complaints pertained to the safety and soundness of HFCU. Keomalu's attorney, when questioned by the circuit court, acknowledged that there is no statute explicitly requiring safety and soundness. Moreover, we decline to hold that general expressions of concern about a credit union's or another employer's business decisions constitute a report of a violation or a suspected violation of the law sufficient to support a whistleblower claim under the HWPA. To hold otherwise would expose employers to liability whenever an employee voices a general concern or reservation about an employer's business decisions and later faces adverse employment action.
Keomalu argues that HFCU violated the law by charging off certain delinquent automobile loans before insurance refunds and proceeds from the sale of the automobile could be applied to the deficiency. Keomalu contends that by prematurely charging off the loans, HFCU violated federal law by misrepresenting its financial condition. We disagree.
We conclude that HFCU's practice of charging off certain delinquent loans before collecting all possible proceeds did not result in an unlawful misrepresentation of HFCU's financial condition. Rather, it provided examiners with a conservative view of HFCU's financial condition. The effect of HFCU's practice was to reduce the assets shown on HFCU's financial statements below the amount that would have been shown if the delinquent loans had not been charged off. After the delinquent loans were charged off, nothing prevented the subsequent collection of insurance refunds or proceeds from the sale of the automobile. If collections could be made on the charged-off delinquent loans, HFCU would be able to offset its losses and update its financial records. There is no evidence that HFCU sought to conceal the practice they employed in charging off delinquent loans. Thus, Keomalu's complaints about HFCU's practice of charging off certain delinquent loans did not constitute a report of a violation or suspected violation of the law.[7]

VIII.
Keomalu contends that the circuit court erred in denying his motion for a new trial. This contention is based on the same arguments he raised in claiming that the circuit court erred in granting judgment as a matter of law, pursuant to HRCP Rule 50, on his HWPA public policy claim against HFCU and his defamation claim against Auyong. We have already concluded that the circuit court properly granted judgment as a matter of law in favor of HFCU and Auyong on these claims. Accordingly, we likewise reject Keomalu's contention that the circuit court erred in denying his motion for new trial.

CONCLUSION
We affirm the circuit court's April 6, 2006, final judgment in favor of Defendants and against Keomalu on all claims raised by Keomalu in his complaint.
NOTES
[1] HFCU asserted a counterclaim against Keomalu and a third-party complaint against Third-Party Defendants Cutter Pontiac, Buick, GMC of Waipahu, Inc. and CJW Motors, Inc. These claims are not relevant to this appeal and will not be further discussed.
[2] The Honorable Eden Elizabeth Hifo presided.
[3] Farmer replaced Ronald K. Kotoshirodo, the former trustee of Keomalu's bankruptcy estate.
[4] HFCU had established a Fair-Issac Company (FICO) credit score of 620 or more as a general condition that a loan applicant must satisfy for loan approval.
[5] Indeed, the record reflects that the special audit reports were disseminated to officers and directors of HFCU who had a professional interest in the audits, and not to the employees of HFCU in general. Moreover, even if the subsequent dissemination to CUMIS is considered, it would not demonstrate that the reports were communicated to the public at large.
[6] Kwock's qualified privilege with respect to the special audit reports provides an additional ground to support the circuit court's dismissal of Keomalu's claim that Kwock conspired with Auyong to interfere with Keomalu's employment contract. See Chow v. Alston, 2 Haw. App. 480, 484, 634 P.2d 430, 434 (1981).
[7] In this case, Keomalu failed to show that HFCU violated (1) the HWPA or 12 U.S.C. § 1790b, the whistleblower provision of the Federal Credit Union Act, or (2) the public policies contained in the HWPA or 12 U.S.C. § 1790b. Moreover, the HWPA and 12 U.S.C. § 1790(b) contain remedies for violations of their provisions, and thus they cannot provide the basis for a Parnar public policy claim. See HRS § 378-64 (1993); 12 U.S.C. § 1790b(c); Ross, 76 Hawai`i at 463-64, 879 P.2d at 1046-47; Takaki, 87 Hawai`i at 63, 951 P.2d at 513.